DREW, J.
|¶ Brandon Deon Thomas was indicted for:
• one count of aggravated rape, La. R.S, 14:42; and
• one count of second degree kidnapping, La. R.S. 14:44.1.
He waived a jury and was found guilty as charged.
The defendant was sentenced to life imprisonment at hard labor for the aggravated rape. He was sentenced to a concurrent 15 years at hard labor for the second degree kidnapping. Each sentence was ordered to be served without benefit of parole, probation or suspension of sentence.
Defendant appeals the sufficiency of the evidence. We affirm.
FACTUAL BACKGROUND
On the- evening of September 13, 2013, defendant’s mother, Brenda Thomas, called 9Í1 to report that her son was “sick,” had been off his medications for two months, and was holding a knife on his girlfriend. A recording of this call was played at the beginning of trial.
C.H.,[1] a 31-year-old female, testified that she met Brandon Thomas, a 24-year-old male, in January of 2013 when she was shopping at a Shreveport grocery store where Brandon worked as a bagger. C.H. and Brandon began dating shortly thereafter. C.H. stated that she is originally from Shreveport, but at the time that .she and Brandon started dating, she was living and working in Lafayette. C.H. stated that their relationship was normal, and they enjoyed one another’s company. Brandon *237 treated C.H. well and was attentive and kind to her. According to C.H., she was Brandon’s first serious relationship.
RC.H. testified that she knew that Brandon took medication for his severe headaches, but did not know the name of his medication. C.H. and Brandon began a consensual sexual relationship about five months into their relationship in May 2013. C.H. expressed to Brandon that she would not engage in unprotected sex or anal intercourse or in oral sex. C.H. testified that Brandon understood and respected her rules. According to C.H., most of their arguments were about her unwillingness to perform oral sex. Despite their disagreements, C.H. testified that she and Brandon had talked about moving in together and getting engaged.
C.H. stated that she arrived in Shreveport from Lafayette around 7:00 p.m, on the evening of September 13, 2013. She had finished her last day of work in Lafayette and was moving back to Shreveport, because she had gotten a job. there. Upon arrival, C.H. went over to Brandon’s house, where he lived with his mother, Brenda. C.H. picked Brandon up and the two drove to C.H.’s parents’ apartment, where she took a shower and collected her things in an overnight bag. She and Brandon then left the apartment and went back to Brandon’s house.
When C.H. and Brandon got back to his house, the two of them went into Brandon’s room and began having consensual sex. C.H. testified that Brandon was being aggressive and was hurting her, so she asked him to stop. Brandon did stop, and C.H. agreed to perform manual stimulation on him. Shortly thereafter, Brandon became angry and told C.H. to leave. She was offended and asked Brandon if he was going “to be like that.” He threw her purse on the floor and told her to get out. Brandon then slapped her, and she slapped him back. C.H. left Brandon’s house and drove back to her parents’ apartment. Brandon and his mom called C.H. several times, and she finally | ^answered his mother’s call. Brandon then showed up at her parents’ home, apologizing for his earlier behavior. C.H. could tell that he was upset, and she agreed to follow Brandon back to his house.
When they arrived at Brandon’s house, C.H. and Brandon sat down in the living room with Brandon’s family, and had a conversation. C.H. felt like things had calmed down and were back to normal. When Brandon’s brother and cousin left, C.H. and Brandon went into his room, closed the door and went to sleep.
C.H. testified that she woke up at some point to see Brandon standing naked .by the lamp holding a large butcher’s knife. He told C.H. to get out of bed. Brandon held the knife to C.H.’s neck, and she sat down in a chair next to the door. He then demanded that C.H. give him oral sex. C.H. complied and began, performing oral sex. According to C.H., Brandon closed his eyes and leaned his head back, at which point C.H. was able to reach the doorknob, open the door, and escape to Brandon’s mother’s room,
C.H. and Brenda tried to close the door to Brenda’s bedroom to prevent Brandon from entering, but he was able to push his way in. He shoved C.H. to the ground, brandished his knife at Brenda, put the knife to C,H.’s throat and demanded that C.H. perform oral sex. C.H. testified that she “gave him oral sex” while in Brenda’s room. C.H. looked toward Brenda, who was sitting in a chair, for help; Brenda advised her just to do what Brandon said when he had the knife to her neck. Brenda told Brandon she didn’t want to see “it,” and to take C.H. back to his room. Brandon asked Brenda where her cell phone was. She replied it was in her car. Brenda *238 told him to take the house phone, which he did.
|4C.H. testified that Brandon grabbed her by the hah.- and led her back to his room, the knife at her throat. Brandon locked the door behind them, started choking her, told her he wasn’t playing with her and demanded that she take off her clothing and perform oral sex. C.H. complied, still at knifepoint. At Brandon’s demand, she got to her knees by the window while this was occurring. At no point during this time did she think she could get away from Brandon; at some point, however, she was able to convince him to put the knife down.
While this was happening, C.H. heard Brandon’s cousin talking to him, trying to get him to open the door, but Brandon refused. According to C.H., it was only when Brandon’s family threatened to break down the door that he told C.H. to stop and to put her clothes on. Brandon then asked her not to tell them what he did to her or that he had a knife, which he hid under some blankets in the closet.
After they both got dressed, he opened the door to find police officers, as well as his mother and brother, at the door.[2] C.H. testified that she remained in Brandon’s room until he was removed from the house. She told Officer Alexander that she was afraid for her life, that Brandon had a knife, and where he had hidden it; police recovered it from Brandon’s closet. According to C.H., Brandon’s brother took the knife from the officers, stating that it was their kitchen knife.
C.H. testified that Brenda was hysterical, yelling that Brandon was sick, and C.H. felt herself shutting down. She was traumatized and scared, especially since the officer told her “it was [her] word against [Brandon’s]” |fiwhen she told him that the knife Brandon’s brother took away from the bedroom was the one Brandon held on her. C.H. stated that at that point, she had not told the officer about the sexual assault.
C.H. testified that she kept trying to talk to the officers at Brandon’s house, but every time she did, Brandon’s mother yelled and talked over her. Brenda repeatedly begged her not to press charges, as her son was sick and needed help. Officer Alexander told C.H. that she needed to change her phone number and cut off communication with Brandon and his family. She told Officer Alexander at that time she did not want to press charges.
C.H. stated that she was initially scared to tell the police what had happened, as well as embarrassed and ashamed. Upon hearing that Brandon would be charged only with a misdemeanor for holding a knife to her throat, she got more frightened that he would retaliate against her. The same night as the assault, once she got home, she got threatening phone calls from Brandon and his family. After Brandon’s mother called her the next day, C.H. got her number changed.
C.H. testified that another reason she did not initially press charges was because she did not feel as though anyone was concerned for her safety and that everyone was focused on Brandon. This was confirmed when she went to the police station on September 19, the day that Officer Alexander said the police report would be ready. Upon reviewing the police report, C.H. saw that it identified Brandon as the victim. C.H. testified that she became upset and was referred to Detective Michael Jones, a detective in the sex crimes division.
C.H. stated that she spoke briefly with Detective Jones, but did not tell him ev *239 erything that had happened the night of the incident. She showed [ (;Det. Jones her injuries and told him they were from the night of September 23. C.H. also agreed to let police take photographs of her injuries, which she described as choke marks and scratches on her neck, bruises on the front of her body, a “bite mark” on her arm, and bruises and scratches on her arm.
C.H. admitted that she spoke with Detective Jones several times before she agreed to give him a recorded statement about the events that took place on September 13, 2013. She finally decided to press charges against Brandon and make a recorded statement to police and Detective Jones on October 10, 2013.
C.H. stated that the last time she saw Brandon was when he left with the police in handcuffs the night of the assault. She received a letter from him, apologizing for what had happened, saying that he had moved on and was dating someone new, and that he was out of the hospital and working. In the letter, Brandon also asked C.H. to drop the charges against him.
Brenda Thomas, defendant’s mother, testified next. She got home between 9:00 and 10:00 p.m. on September 13, 2013, and Brandon was the only one in the house. Brenda said he was visibly upset and demanded her car keys. She tried to stop him from leaving, but he told her no and said he had been thinking about hurting himself. Brandon then left Brenda’s house in her vehicle.
Initially, Brenda testified that she did not have a family meeting with C.H. and Brandon after they came back from C.H.’s house. However, on cross-examination, Brenda admitted to talking with C.H. and Brandon — but not Brandon’s brother or cousin — about Brandon’s medications. After the family meeting, C.H. and Brandon went back to Brandon’s room and closed the door. Brenda testified that she was getting ready for bed, standing by her 17dresser, when C.H. ran into her room. Brenda did not recall whether she helped C.H. close the door to prevent Brandon from coming into the room. According to Brenda, Brandon came into her room completely naked; Brenda put a cover over her head. She testified she was afraid, as Brandon was off his meds and she didn’t know what “he was capable of.”
On cross-examination, Brenda testified that she did not tell Brandon and C.H. to go back to Brandon’s room; rather, C.H. was the one that told him to leave Brenda’s room. Brenda denied hearing or seeing Brandon tell or force C.H. to give him oral sex. After they left Brenda’s room, they went into Brandon’s room and closed the door. She stood outside Brandon’s door and tried to listen in. She asked C.H. if everything was okay, and C.H. told her that everything was fine. Despite C.H.’s reassurance, Brenda decided to call 911 because “Brandon was sick and I didn’t know what he was capable of.”
While Brenda testified that she did not remember saying anything to the operator about a knife or seeing Brandon holding a knife, she did remember C.H. whispering something about a knife, and she was present when the police discovered a knife in Brandon’s closet. Brenda also testified that she did not recall telling the 911 operator that she heard C.H. say, “No, Brandon,” or that she was worried he might harm C.H. She also did not recall telling police officers that Brandon had been making C.H. do something that she did not want to do.
On questioning by the court, Brenda said she was afraid merely because Brandon came into her room naked; he made no threats.
Corporal Wyatt Alexander testified that he responded to Brenda Thomas’s 911 call *240 and was told that the caller’s son was being disorderly |sand “not acting right.” Upon arrival at the Thomas home, Officer Alexander first made contact with Brenda, who told him that Brandon was bipolar, had not been taking his meds, was locked in the bedroom with his girlfriend, C.H., and had a knife. Officer Alexander then attempted to open the door to Brandon’s room, but it was locked. Officer Alexander knocked on the door and advised that he was with the police department; after that, it took “no more than a minute or two” to get Brandon to open the door.
Officer Alexander testified that Brandon was escorted out of the bedroom by another police officer, who took Brandon into the kitchen. While in the kitchen, Brandon admitted to the officer that he had been off his medication for a couple of months because it was giving him headaches. The officer then took Brandon to LSU Medical Center in Shreveport where he was committed to the psychiatric ward.[3]
Officer Alexander encountered C.H., who was sitting on the bed, visibly shaking and crying. She told him that Brandon had wanted to have unprotected sex with her, got angry when she refused, and then came at her with a knife.
According to Officer Alexander, during his conversation with C.H., the door to Brandon’s bedroom was closed and no one else was in the room; however, he also stated that Brenda was “definitely” within earshot.
Officer Alexander testified that C.H. was not very forthcoming, but his account of her statement to him, while much more general, was substantially similar to C.H.’s trial testimony. Specifically, C.H. told him | ¡¡that when she ran to Brenda’s room, Brandon, still holding the knife, followed her. He held the knife to her throat and told her to perform oral sex on him or he was going to kill her. C.H. told Officer Alexander she did what Brandon demanded, then they left Brenda’s room and went back to Brandon’s room. All this took place in front of Brenda. C.H. told Officer Alexander that Brandon told her and Brenda not to call the police or he would hurt them.
Because C.H. was still shaken up and scared, Officer Alexander followed her home. He admitted he never saw a knife, but said he thought one was recovered, either in Brandon’s room or put back in the kitchen. Officer Alexander also testified that he asked C.H. on at least three separate times that night if she wanted to press charges against Brandon. Thé first time, she said she did not know; the second and third times, she said she did not want to press charges.
Detective Michael Jones testified that he interviewed Brandon at the Shreveport Police station on October 14, 2013.[4] Detective Jones stated that he read Brandon his Miranda rights and provided him with a copy, which Brandon verbally acknowledged and signed, indicating his understanding. Detective Jones related that the interview with Brandon was short, and Brandon repeatedly said that he did not remember anything from the night in question because he “blacked out.” However, Brandon was able to provide vivid details of other aspects of and events that occurred during his and C.H.’s relationship. Brandon also told him that he was *241 not on his medication at the time of the interview.
| inDetective Jones testified that he met with and interviewed C.H. on multiple occasions between September 19 and October 10, 2013. On September 19, 2013, C.H. told Det. Jones that she wanted to press criminal charges against Brandon for his actions on September 13, 2013, because she had learned that the police report from that day indicated that Brandon was the victim, when she, in fact, was actually the victim. C.H. told him that she still had bruises and injuries from the incident. Later that evening, C.H. returned to the police station and let another detective take pictures of her injuries. After the photographs were taken, Det. Jones spoke with C.H. for about an hour, but she did not get into a lot of detail about what had happened on September 13 because she was very afraid of Brandon and what would happen if she reported everything to the police.
Detective Jones spoke with C.H. on at least two other occasions before she was comfortable giving him a recorded statement on October 10, 2013. He described her recorded statement as consistent with her prior oral statements. (It was also substantially similar to C.H.’s trial testimony.)
Det. Jones also testified that because C.H. was so afraid of what Brandon might do if he found out she was talking to the police, he had C.H. talk to several advocates, including a SANE or sexual assault nurse examiner, to help her understand the lengths to which they would go to keep C.H. safe.
Detective Jones testified that he interviewed Brenda Thomas at her home on October 14, 2013. According to Detective Jones, Brenda was able to provide details about the incident:
JONES: She heard C.H. yell later: Brandon, no. Brandon, no. And then at that point, C.H. ended up breaking into her bedroom. And Brandon followed and he |nwas naked. She said that Brandon was trying to get C.H. to do something to him that she didn’t want to do.
PROSECUTION: Did she elaborate about that at all?
JONES: She did not, but she stated it was something that she did not want to do — that C.H. didn’t want to do. She stated she did cover her face and head up and told him to get C.H. out of there and get back in, I guess, his bedroom. So and then he made the statement that if she said anything that he would kill himself.
Travesa Foster, one of Brandon’s cousins, was the first witness called by the defense. Ms. Foster testified that she arrived at Brenda’s house on September. 13, 2013, around 10:00 or 11:00 p.m., and C.H. and Brandon were already at the house in Brandon’s bedroom’. Ms. Foster said that she, Brenda, and C.H. told Brandon that they weré concerned that he was not taking his medication. Ms. Foster also testified that C.H. told Brandon that he would be OK so long as he took his medication and then gave him a hug. According to Ms. Foster, this family meeting lasted 20 or 30 minutes; after this, C.H. and Brandon went back to Brandon’s room, and C.H. went voluntarily. Ms. Foster testified that she stayed for an additional 10-15 minutes before deciding that everything had calmed down, so she headed back home. Ms. Foster told the court that she was not at, Brenda’s house when the police arrived.
*242 Brandon Thomas testified in his own defense.[5] He described how he and C.H. met, and their eight-month relationship. As C.H. had stated, Brandon related that their relationship did not become sexual until they had been together five months. Brandon testified that during the relationship, he | Tjjtold C.H. that he was on medication for schizophrenia. While he and C.H. were dating, she went with him to the Shreveport Mental Health Clinic for appointments and to pick up his medication.
According to Brandon, most of his and C.H.’s arguments were about money and finances; none of their disagreements were about sex and none of them got “physical.” C.H. pushed Brandon to get a full-time job, obtain his driver’s license and otherwise better himself. Brandon testified that he attempted to break up with C.H. numerous times during their relationship, but each time, C.H. begged him to come back and he agreed. He and C.H. broke up one time because he told her that he could not afford a $5,000 engagement ring that she wanted. Brandon testified that C.H. was “obsessed” with him and was the one who would always beg him to come back.
Brandon testified that the fight he and C.H. had on September 13 was about finances. According to Brandon, she was tired of him “not having no money,” and she just left to go home. After she left, Brandon testified that he was upset. He had not been taking his medication for two months and was depressed because he couldn’t help provide for his family, so he wanted to go “ride around.” He briefly spoke to his mother before leaving and told her that he was thinking about hurting himself. Brandon said that he took his mother’s car keys and left the house. After Brandon drove off in Brenda’s car, his mother called C.H. because she was concerned about her son.
Brandon went to C.H.’s house, they talked, and she followed him back to his house, where she took part in the family meeting, the topic of which was him not taking his medication. They then watched television and |13he and C.H. went to his room. They made up for the earlier argument, and then had sex and went to sleep. In the middle of the night, he woke her up and told her he was having thoughts of harming himself; C.H. left the room, and Brandon followed her into his mother’s room. He admitted he was not in his “right mind,” and pushed C.H. against the wall, clutched her throat, and grabbed her arm. And yet, according to Brenda, C.H. told him, “Let’s go back to my room,” and they did; at this time, Brenda called the police. Brandon testified that he got dressed, opened the door when the officer knocked, went to the kitchen and the officer asked whether he was taking his medication and needed to go to the hospital. He eventually told the officer he had not been on his medication and did need to go to the hospital; he was inpatient for a week, then went back to Shreveport Mental Health and was put on a lower dose of medication. Brandon stated that he had stopped taking his medication previously because it gave him headaches. Brandon testified that he went back to his job at Albertson’s and began dating someone else.
On cross-examination, Brandon testified that he and C.H. never argued about sex; however, he later admitted that such a fight might have happened in the past. He denied forcing C.H. to perform oral sex in his room; forcing C.H. to perform oral sex in Brenda’s room; dragging C.H. from Brenda’s room by her hair; forcing C.H. to perform oral sex when back in his room; *243 or, ever holding a knife to C.H.’s neck. In fact, Brandon insisted no knife was involved, but admitted telling a psychiatrist, Dr. George Seiden, that he had held a life to C.H.’s throat. The state also questioned Brandon about the sexual boundaries that C.H. had set. He admitted that C.H. told him she was unwilling to do oral and unprotected [14sex, but that she started doing these acts by June 2013, and did so on the night of the offense. He also claimed he did not mention these facts to Det. Jones in the recorded interview because he was not “comfortable” doing so, but maintained he was comfortable about testifying to them in court.
At that point, the defense rested.
On September 16, 2015, the trial judge found Brandon guilty as charged of aggravated rape and second degree kidnapping. The trial judge provided a comprehensive explanation for his verdict on the record. In part, the trial judge stated:
The defendant testified essentially that consensual oral, unprotected sex occurred, and the victim testified that quite the contrary, that at knifepoint she was forced to perform unprotected oral sex, that she was dragged forcibly into Ms. Thomas’s room, and that she was then returned to the defendant’s room again at knifepoint.
The Court does find that State’s Exhibit 11, the apology letter [written by defendant while he was in jail], seems to apologize for more than the simple push that the defendant described from the witness stand that he had administered to the victim that night. And the Court does find that the victim was credible. The Court does find that Ms. Thomas, who is in an extremely difficult position, as the mother of an accused in such a serious charge, essentially gave two very different statements. One, her testimony in court, and the second, her testimony or the evidence adduced through her statements to the 911 operator. The Court cannot reconcile both as being true. The Court heard on the 911 tape someone who was in the throws [sic] of terror, that was hysterical and that mentioned that her child had a knife, that she was outside of the house, and that she did not know what he was capable of. And two things that struck the Court, she also said he is threatening to hurt himself too, which implied to the Court that the ... threat against himself was not the only threat being made. The Court believes that if it were merely threats against himself for Ms. Thomas to maintain her presence outside of the house during the 911 call would not be what the Court would expect to have occurred.
Ms. Thomas also did give one piece of interesting testimony that the police did, in fact, find a knife in the defendant’s closet. The Court notes that the defendant was somewhat equivocal on hsthat point, saying that there was no knife involved, but that he had a knife to show that he would hurt himself.
[[Image here]]
The Court reviewed the photographs which were taken allegedly five days after this incident and finds they are evidence of physical abuse consistent with the victim’s testimony and inconsistent with the defendant’s account of the events that occurred, namely, that he simply pushed her, and she bumped into the wall. I do not find that those injuries are explained by a grab, a push and a bump. The Court also finds that Officer Alexander corroborated that at the scene, the victim was describing ... nonconsensual sex at knifepoint.
So essentially, the Court has to determine who is credible. Is it [C.H.] or the defendant? The Court finds that the *244 victim’s testimony is repeatedly corroborated by the testimony of Officer.Alexander, by the consistency of her statements to Detective Jones, ■ and most importantly by the 911 recording that is contemporaneous and unfiltered and made in the heat of the moment in which the Court believes he is hearing a very terrified person in an impossible situation. The Court did not find the defendant credible at all based on the inconsistencies between his description of the relationship and his actions and the victim’s injuries and his description of his attack on her.
The Court does find that it is proven beyond a reasonable doubt that [C.H.] was transported against her will, therefore being secreted and forcibly transported in violation of the second degree kidnapping statute. And the Court does find that the photographs constitute evidence of abuse. And the Court further finds that there is evidence of sexual abuse. The Court does find that because the evidence convinced the Court-beyond a reasonable doubt, the. Court is firmly convinced that the defendant was armed with a dangerous weapon during this incident and did compel [C.H.] against her will to perform oral sex. I therefore am required and I do concede that on these facts, ... the Court finds the defendant guilty as charged on both counts.
The court later denied Brandon’s motion for new trial or post-verdict judgment of acquittal. The court then sentenced him to life imprisonment at hard labor without the benefit of parole, probation or suspension of sentence for his aggravated rape conviction. The trial court imposed a sentence of 15 years’ imprisonment at hard labor without the benefit of parole, probation or |1fiSuspension of sentence for the second degree kidnapping conviction. The two sentences were ordered to be served concurrently.
Brandon later filed a motion to reconsider sentence, which was denied. This appeal followed.
SUFFICIENCY OF THE EVIDENCE
Brandon argues that the trial court erred in finding him guilty of aggravated rape and second degree kidnapping beyond a reasonable doubt. Brandon argues that, even though C.H.’s testimony supports the convictions, when her testimony is viewed against his testimony and that of his mother, C.H.’s testimony alone is both insufficient and noncredible. Brandon asserts that his and his mother’s testimony support the reasonable hypothesis that C.H. and Brandon engaged in rough sex and had a fight, which resulted in the injuries to C.H. and led C.H. to falsely accuse him of rape and kidnapping. Finally, Brandon argues that his eventual arrest was based on claims that were made by C.H. after she realized that Brandon— rather than C.H. — was listed as the victim on the police report on the night of September 13, 2013.
On the other hand, the state argues that the evidence presented at trial, viewed in the light most favorable to the prosecution, was sufficient to support both convictions. The state references C.H.’s testimony and notes that it was corroborated by her previous statements to Officer Alexander and Detective Jones. According to the state, the trial judge did not abuse its discretion by finding C.H., Officer Alexander and Detective Jones to be credible, while finding Brandon and Brenda’s testimony to be noncredible.
In a bench trial, Louisiana law neither requires nor precludes a statement of reasons supporting the verdict returned by the court sitting asJjjthe fact finder in the case; however, if a trial judge chooses to *245 do so, the statement of reasons may provide a useful guide to the appellate court for reviewing the sufficiency of the evidence under the Jackson standard. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Harris v. Rivera, 454 U.S. 339, 102 S.Ct. 460, 70 L.Ed.2d 530 (1981); State v. Marshall, 04-3139 (La. 11/29/06), 943 So.2d 362.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen, 36,180 (La.App. 2d Cir. 9/18/02), 828 So.2d 622, writs denied, 02-2595 (La. 3/28/03), 840 So.2d 566, 02-2997 (La. 6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004). The pertinent inquiry in bench trials remains — as it does in jury trials — on the rationality of the result and not on the thought processes of the particular fact finder. Harris v. Rivera, supra; State v. Marshall, supra. The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Casey, 99-0023 (La. 1/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000).
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Wiltcher, 41,981 (La.App. 2d Cir. 5/09/07), 956 So.2d 769; State v. Burd, 40,480 (La.App. 2d Cir. 1/27/06), 921 So.2d 219, writ denied, 06-1083 (La. 11/09/06), 941 So.2d 35.
Likewise, the testimony of a sexual assault victim alone is sufficient to convict a defendant. Such testimony is sufficient even where the state does not introduce medical, scientific, or physical evidence to prove the commission of the offense by the defendant. State v. Holman, 46,528 (La. App. 2d Cir. 9/21/11), 73 So.3d 44; State v. Chandler, 41,063 (La. App. 2d Cir. 9/08/06), 939 So.2d 574, writ denied, 06-2554 (La. 5/11/07), 955 So.2d 1277; State v. Ellis, 38,740 (La. App. 2d Cir. 08/18/04), 880 So.2d 214.

Aggravated Rape

La. R.S. 14:42, Aggravated rape (now entitled first degree rape), states in pertinent part:
A. Aggravated rape is a rape committed upon a person ... where the anal, oral, or vaginal intercourse is deemed to be without lawful consent of the victim because it is committed under any one. or more of the following circumstances:
(1) When the victim resists the act to the utmost, but whose resistance is overcome by force.
(2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by the apparent power of execution.
(3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.
Sufficient evidence existed to convict Brandon of aggravated rape. C.H.’s trial testimony was corroborated by her statements to Officer Alexander and Det. Jones. While it is true that Brandon and Brenda’s testimony set forth an alternative theory, the trial court made a reasonable credibility call when it chose to believe C.H., Officer Alexander and Pet, |19Jones *246 over Brandon and Brenda.[6] Also supporting the trial judge’s finding, as detailed in his reasons, were the mother’s 911 call, Brandon’s apology letter to C.H., and the photographs of C.H. taken five days after the incident. When viewed in the light most favorable to the state, the facts show that Brandon forced C.H. to engage in oral sexual intercourse on three separate times in two different locations: in his bedroom, in his mother’s bedroom, and once again in his bedroom, while he was armed with a knife. The facts further show that Brandon threatened and attempted to choke C.H. upon returning to his room after leaving Brenda’s room — which C.H. took to mean that he could and would kill her unless she performed oral sex.

Second Degree Kidnapping

La. R.S. 14:44.1, Second degree kidnapping, states in pertinent part:
A. Second degree kidnapping is the doing of any of the acts listed in Subsection B wherein the victim is: ....
[[Image here]]
(3) Physically injured or sexually abused;
[[Image here]]
B. For purposes of this Section, kidnapping is:
[[Image here]]
(3) The imprisoning or forcible secreting of any person.
There was also sufficient evidence to convict Brandon of second degree kidnapping. For the reasons stated above, the trial court did not abuse its discretion when it made a credibility call and gave more weight to the testimony of C.H., Officer Alexander and Det. Jones than to that of Brandon and Brenda. Viewed in a light most favorable to the prosecution, these facts established that Brandon forced C.H. to leave Brenda’s bedroom and return to his room, locked the door when he and C.H. returned to his | ¡>nbedroom to prevent her from leaving, and, back in his own room, choked and threatened C.H. and forced her to perform oral sex.
EXCESSIVENESS OF SENTENCE
Brandon argues that the sentence of life imprisonment without benefits for the aggravated rape conviction was constitutionally excessive.[7] According to Brandon, there are multiple circumstances that support the contention that he is “exceptional” and that a downward deviation from the mandatory sentence was warranted: (a) he was 24 years old at the time of the crimes; (b) he has a significant employment history; (c) before the crimes at issue, he and C.H. were in a relationship and, while admittedly rocky, the two had been contemplating marriage; and, (d) on the date of the incident he was unemployed, depressed, stressed out, bipolar, schizophrenic, and off his psychiatric medication for two months.
While Brandon admits that the crimes for which he was convicted were severe, he argues he is a defendant “driven as much by poor mental health as by intentional decisions” and, as such, is someone “whose future conduct can be controlled medicinally.”
*247 The state responds that Brandon’s sentence for aggravated rape was not excessive, and that he failed to meet his burden of proving that a downward deviation below the mandatory minimum was warranted.
Prior to sentencing Brandon, the trial judge identified and discussed what he determined to be the relevant La. C. Cr. P. art. 894.1 factors:
• (A)(1) Undue risk that during suspended sentence, Brandon would commit another crime.
hi* (A)(2) Brandon is in need of correctional treatment.
• (A)(3) A lesser sentence would deprecate the seriousness of the crime.
• (B)(1) Brandon’s conduct during the commission of the offense manifested deliberate cruelty to C.H. Specifically, “this particular act was one that the victim had particularly expressed an aversion to and an unwillingness to perform even in the confines or context of the consensual sexual relationship.”
• (B)(6) Brandon used threats of or actual violence in the commission of the offense.
• (B)(10) Brandon used a dangerous weapon in the commission of the offense.
• (B)(21) Any other relevant aggravating circumstances. The court noted, “The implication of and the involvement of dragging the victim into the presence of another person to assault them in this way. This is particularly aggravating ... and of course it is also a betrayal of the relationship that existed between the defendant and the victim in this case.”
• (B)(28) Brandon has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the instant crime: Brandon has one prior felony conviction, which is not indicative of an extensive criminal history.
• (B)(33) Any other mitigating circumstances: Brandon has a history of mental health issues.
The trial judge is given wide discretion in the imposition of sentences within the statutory limits, and the sentence imposed by the court should not be set aside as excessive in the absence of a manifest abuse of that discretion. State v. Williams, 03-3514 (La. 12/13/04), 893 So.2d 7; State v. Houston, 50,126 (La. App. 2d Cir. 11/18/15), 181 So.3d 188; State v. Diaz, 46,750 (La. App. 2d Cir. 12/14/11), 81 So.3d 228.
In State v. Dorthey, 623 So.2d 1276 (La. 1993), and State v. Johnson, 97-1906 (La. 3/04/98), 709 So.2d 672, the Louisiana Supreme Court addressed the issue of mandatory sentences in the context of the habitual 122offender law. The court held that the downward departure from a mandatory minimum sentence may occur in rare circumstances if the defendant rebuts the presumption of constitutionality by showing clear and convincing evidence that he is exceptional, namely, that he is a victim of the legislature’s failure to assign sentences that are meaningfully tailored to the gravity of the offense, the culpability of the offender, and the circumstances of the ease.
This rule has been extended to mandatory sentences beyond habitual offender cases. See State v. Fobbs, 99-1024 (La. 9/24/99), 744 So.2d 1274; State v. Chandler, 41,063 (La. App. 2d Cir. 9/08/06), 939 So.2d 574, writ denied, 06-2554 (La. 5/11/07), 955 So.2d 1277. The “rare circumstances” in which a mandated sentence can be altered are even less likely in the case of a life sentence chosen by the legislature *248 for a single crime, such as aggravated rape or second degree murder. State v. Chandler, supra. In such crimes, unlike the mandatory minimum sentence under the habitual offender law, the “tailoring” of the sentence by the legislature was for life because the culpability of offenders and the gravity of the offense are so great. Id.
La. R.S. 14:42, Aggravated rape, states in pertinent part: (D)(1). Whoever commits the crime of aggravated rape shall be punished by life imprisonment at hard labor without the benefit of parole, probation or suspension of sentence.
Brandon was sentenced to the mandatory sentence of life imprisonment without the benefit of parole, probation or suspension of sentence on the aggravated rape conviction.
A review of the record reveals that the trial court conducted an extremely thorough analysis of the factors it considered when sentencing Brandon. The court explicitly acknowledged that he considered Brandon’s | ^age, relatively negligible criminal history, and history of mental illness. Thus, the record presents an adequate factual basis for Brandon’s sentence.
Furthermore, Brandon has failed to show that he is an “exceptional” defendant who warrants a downward departure from the mandatory life sentence because of his history of mental illness and the prospect of deterring future misconduct by medical treatment and prescriptions. The trial court expressly considered Brandon’s mental illness during sentencing, but ultimately determined that it did not warrant a downward departure, primarily because the sanity commission easily found that Brandon could tell right from wrong at the time of the offense. See State v. Mudd, 46,324 (La. App. 2d Cir. 5/18/11), 69 So.3d 574. Based on the brutality of the crimes and the injuries sustained by C.H., we cannot say that Brandon’s life sentence for aggravated rape shocks the sense of justice. Therefore, this assignment of error is without merit.
CONCLUSION
For the foregoing reasons, the convictions and sentences of Brandon Deon Thomas are AFFIRMED.

. Initials of the victim are used in this case to protect the victim’s identity. La. R.S. 46:1844(W).

. When Brandon and C.H. left Brenda’s room to go to defendant's room, Brenda called 911.

. Brandon was admitted to LSU Medical Center on September 13, 2013, and stayed for about a week, The trial court subsequently found Brandon competent to stand trial on September 4, 2014.

. Prior to Detective Jones’s testimony, the court found the defendant’s statement to be free and voluntary.

. Prior to Brandon’s testimony, the court questioned him and defense counsel to ensure that he understood his Fifth Amendment protection against self-incrimination.

. We note that the trial judge did not just say that defendant was not credible, but gave a very specific basis for its conclusion: the inconsistencies between Brandon's description of the relationship between himself and C.H., his actions and the victim’s injuries and his description of his attack on her.

. Because Brandon does not argue that his 15-year sentence for second degree kidnapping was excessive, our review is limited to the aggravated rape sentence.