Judgment rendered July 13, 2022.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 54,492-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

Versus

DEVONTAE DEMARQUIS                          Appellant
COLEMAN

* * * * *

Appealed from the
Fourth Judicial District Court for the
Parish of Ouachita, Louisiana
Trial Court No. 17-F1839

Honorable Larry Donell Jefferson, Judge

* * * * *

LOUISIANA APPELLATE PROJECT            Counsel for Appellant
By: Bruce G. Whittaker

ROBERT STEPHEN TEW                     Counsel for Appellee
District Attorney

DARWIN C. MILLER
R. NICHOLAS ANDERSON
Assistant District Attorneys

* * * * *

Before MOORE, STONE, and STEPHENS, JJ.

**STEPHENS, J.**

On August 3, 2017, defendant, Davontae Demarquis Coleman, was indicted for the second degree murder of Junius Benton, a violation of La. R.S. 14:30.1. Coleman was tried by a judge after waiving his right to jury trial on March 15-16, 2021. The judge took the matter under advisement and entered a verdict of guilty of negligent homicide on April 12, 2021. Thereafter, the judge sentenced Coleman to imprisonment at hard labor for three years, with credit for time served, on July 2, 2021. Coleman appeals his conviction, urging insufficiency of the evidence. For the reasons set forth below, we reverse Coleman's conviction and sentence.

### FACTS/TRIAL TESTIMONY

Coleman's trial on March 15, 2021, began with a "free and voluntary" hearing. After testimony from the interviewing officer, Det. Mike Fendall, the trial judge found that the statement Coleman made to Det. Fendall during an interview at Monroe Police Department ("MPD") shortly after the shooting of Junius Benton was freely and voluntarily made and therefore admissible. Coleman's taped statement was then played. In his statement Coleman gave his approximate location at the time of the shooting as, in the words of Det. Fendall, "the end of the driveway that faces north" about "[a] couple hundred yards" or "half a block or so" west of the intersection; Coleman also stated that, at the time of the shooting, he was standing near the victim, Junius Benton. During the interview, Coleman admitted to the detective to having a gun at the scene and firing it twice into the air. Coleman stated that, after the incident, he threw the gun into an overgrown empty lot near his house. Officers were not able to recover the weapon.

Corporal Kasonya Coleman (no relation to defendant Coleman) testified that on June 27, 2017, MPD officers were dispatched to the intersection of Milliken and Long Streets in Monroe in response to a report of "shots fired." Cpl. Coleman stated that she and Officer K. Lloyd were the first officers to arrive on the scene. Neighbors informed Cpl. Coleman that a 16-year-old, subsequently identified as Junius Benton, had been injured and transported to E.A. Conway Hospital. Cpl. Coleman located the spot where the victim had been injured—near a storm drainage grate—and she blocked off that area. Blood evidence was found at the scene. Witnesses, while for the most part reluctant to cooperate with officers, related that Coleman had been standing near the residence at 1114 Milliken when the shooting started.

Cpl. Coleman took photographs of the scene which were admitted into evidence at trial. She also transported Jadarrius Sears, who had approached her while she was photographing the scene, to the MPD headquarters to take his statement. Sears related that he and Freddy Kendrix had argued and fought earlier that day. Several hours later, Kendrix came back to the intersection of Long and Milliken Streets with the victim, Junius Benton, and several other males. Sears told Kendrix he would fight him or anyone else who approached him. It was then that Sears heard gunshots. Sears heard the victim scream that he had been shot.

Detective Darren Canales arrived on the scene and the investigation was turned over to him. Upon learning that the victim had been taken to the hospital, Det. Canales drove there to check on him. Det. Canales spoke to officers at the hospital and learned that the victim had died; he also found out that there had been a vehicle involved in the shooting that had been secured. MPD officers received information from Monroe Housing

2

Authority employees that one of the surveillance cameras at the Housing Authority office located on Milliken Street had captured the shooting on video. Det. Canales secured the video, which was introduced into evidence and played for the judge at trial. Det. Canales took photos of the scene as well.

Det. Canales also spoke with a witness, Latoria Winder, who related that she saw Jadarrius Sears, her across-the-street neighbor, as well as his brother Jaylon Brown at the scene with a firearm. Det. Canales spoke with the brothers. Sears told Det. Canales about a firearm, a 9 mm Taurus, which was recovered from a closet at Sears' home after his mother gave officers permission to enter and search the residence. A second firearm, a Ruger .380, was found on the body of the deceased victim at the hospital.

Dr. Frank Peretti, an expert forensic pathologist, testified that he performed the autopsy on the victim's body. Dr. Peretti determined the cause of death to be a single gunshot wound to the victim's left upper chest. Dr. Peretti testified that there was no evidence of soot deposition, gun power, stippling, or muzzle imprint on the victim's skin, indicating that it was a distant gunshot wound. Dr. Peretti recovered a large caliber bullet from the right pleural cavity of the victim's body and stated that the trajectory of the bullet was from left to right, front to back, and downward. As Dr. Peretti described it, the bullet went through the victim's lung and just dropped into the pleural cavity.

Kendall Stracener, the lab director and a firearms examiner at the North Louisiana Crime Lab, was accepted by the trial judge as an expert in forensic firearms and identification. Stracener identified the Taurus 9mm and Ruger .380 he test-fired the week before trial and testified that the spent

projectile recovered from the victim was consistent with a .380 caliber bullet. Specifically, Stracener stated that the projectile in question had been fired from the barrel of a weapon rifled with six lands and grooves with a right twist. Stracener stated that the bullet did not come from either the Ruger .380 found on the victim (State's Exh. S-12) or the 9 mm Taurus pistol alleged to have been possessed by Jaylon Brown (State's Exh. S-13) on the date of the shooting.

Fredrick "Freddy" Kendrix testified Isaiah and Japhares Rucks are his first cousins. In June 2017, he was 18 or 19 years old. He was acquainted with Junius Benton, whom he knew as "June Bug." On the day of the incident, June 27, 2017, Kendrix had been at June Bug's house. Kendrix was also familiar with Sears, whom he referred to as "J.D." Kendrix stated that he had an "issue" with J.D. earlier in the day. Later that afternoon, Kendrix and a couple of guys were at the Milliken and Long intersection. An argument developed among the gathering crowd. Kendrix stated that at some point J.D. told his brother [Jaylon Brown] to "shoot [Kendrix] in the face. Kendrix testified, "[t]hen [Jaylon] pulled out the gun. I had closed my eyes." Kendrix stated that he was in the middle of the street in front of Jaylon and J.D. There were a "couple of guys" behind him.

At that point, Kendrix was asked to view the video from the Housing Authority office that had been introduced into evidence. Kendrix couldn't see himself or the others in the video, but was certain that he was out there at the time. Kendrix stated that when the shots rang out, he was in the middle of the street "in front of J.D." Kendrix also testified that Jaylon was in front of him when the sound of gunfire erupted. Kendrix did not know where Coleman, Isaiah, Japhares, Joe, or Derrick were when the gunshots went off,

4

but because they weren't in front of him, they had to have been behind him. He didn't know where June Bug was, but by the time Kendrix realized that June Bug had been shot, Kendrix had turned around and June Bug was on his left side behind him. Isaiah was helping June Bug, Coleman was on the side of a house, … "[e]verybody just scattered when they heard gunshots." Kendrix identified Coleman in court and noted that he was previously acquainted with him and considered him a friend.

On cross-examination, Kendrix stated that J.D. and another fellow had "jumped" him earlier in the day. Jaylon had a gun, but neither Kendrix nor J.D. were armed at the time of the shooting. Kendrix testified that after he closed his eyes and heard gunshots, he realized he wasn't shot, and started running. As he ran, Kendrix was Jaylon, who was "running, shooting with the gun at me." According to Kendrix, Jaylon fired more than once. Kendrix related that he did not know where Coleman and June Bug were at the time of the gunfire. To his knowledge, Coleman did not have a gun in his possession at the scene. Kendrix testified that he helped get June Bug to the hospital. Even as they were getting the injured June Bug into a vehicle to take him to the hospital, J.D. was "still talking smack" to him, stated Kendrix. As they tended to June Bug, he repeatedly stated, "Jaylon shot me. Jaylon shot me."

On redirect, Kendrix testified that he couldn't tell where all of the gunshots were coming from, but "when Jaylon pointed the gun at me, I heard gunshots in front of me. I thought I was hit. That's the only—that's when I heard gunshots." Kendrix stated that he did not know whether he heard gunshots coming from behind him.

Isaiah Rucks gave a statement on the night of the shooting to Dets. Canales and Fendall. In this statement, Isaiah described the victim as "like a brother." Due to his young age, Isaiah's mother was with him at the station when he gave his statement. According to Isaiah, at the moment of the shooting, he was on the left side of Long Street. In front of him were Kendrix and J.D. The victim was behind Kendrix. To Isaiah's left was his brother Japhares Rucks. Isaiah viewed the video during his testimony and identified the people on screen for the judge. At 8:44 into the video, everyone began running because that's when "Jaylon's brother J.D. said shoot, shoot that N-----, that's basically what he said, shoot that N-----."

Isaiah testified that his brother Japhares pulled out a gun and dropped it, never having fired it. When Benton realized he had been shot, he yelled, "I'm hit. I'm hit. Jaylon hit [me], Jaylon hit [me]." Isaiah testified that Jaylon only fired once. He didn't know how many times Coleman fired. Isaiah stated that the only people he "saw" in possession of guns at that time were Jaylon and "Sed." It was later that he learned that his brother Japhares and Coleman were armed, and that Coleman had fired a gun. Isaiah testified that Coleman was running with the other people in response to the gunfire. Coleman told Isaiah that "he shot but he told me he never did [shoot] June Bug. He said he shot in the air."

Detective Mike Fendall testified that he was called out to the scene to assist Det. Canales. Det. Fendall described the scene as "fairly chaotic" and very busy. There were a lot of people there, many who didn't want to speak with police. Ofc. Coleman related to him that the victim's father, Dennis Benton, told her that he had heard that Jaylon Brown had shot his son. J.D. Sears and Jaylon Brown were brought to MPD for questioning. Det. Fendall

spoke to Isaiah Rucks.  According to Det. Fendall, they discovered that there were two groups fighting against each other, and "it was very hard to distinguish who was on what side of this fight.  Jaylon and…J.D. being on one side…and most of the [other] gentlemen…on the northern side of the fight…"

Det. Fendall noted the Taurus 9mm pistol seized from Jaylon and J.D.'s home, and the .380 recovered from the pocket of the victim, both of which were logged in by MPD.  The detective also observed that there was a third firearm,  .380 possessed by Japhares, as well as a fourth weapon linked to Coleman, neither of which was ever recovered.  According to Det. Fendall, after waiving his rights, Coleman admitted to possessing a firearm at the scene at the time of the shooting.  However, Coleman told Det. Fendall that after the shooting, he got rid of the gun in a wooded area west of his home.[1]

In response to an "invitation" by the State's attorney to tell the court why Coleman was arrested for second degree murder in this case, Det. Fendall answered as follows, while utilizing the video, enlarged, slowed down, and at points during the detective's testimony, frozen:

> …[T]he initial fight started between Mr. Freddy Ray [Kendrix] and J.D. Sears…. [T]hat fight escalated into another incident… And the crowd came up.  And at that point in time, … more cars and in the video, you'll see, more cars and people started showing up when this occurred.  At one point in time and I'm not going to be able to point exactly but, in this area, somewhere around here, it's supposed—well, Jaylon, Jaylon Brown pulled a gun, *believed to be the one that was recovered, the black Taurus*.  Pulled a gun and pointed it at Freddy Ray…. You'll see the crowd kind of move and hesitate *like something just happened* and then the crowd settles and then after a split couple of seconds, you'll see the crowd flinch, flinch again *like*

---

[1] There is no testimony regarding the efforts to recover the .380 Japhares had in his possession on the date of the shooting.

*a shot was fired.* We watched the video I cannot tell you how many times, hundreds of times. We spent hours just looking at a couple of seconds and in the video, … there's a lot of play right in this area that there's a lot of things, multiple things going on at one time. *So, one of the reasons why we had to watch this video over and over again, we would actually have to concentrate on one person at a time to see what those person's actions were to determine who fired that fatal shot that led to this incident….*

[Discussion among attorneys and Court; defense objection overruled].

…So, continuing on, this is the spot as I pointed out a little earlier where [the victim] was struck with the bullet, *we believe.* This location area right here as I pointed out is close to where *we believe where Devontae [Coleman] was….* As the shots were going off and I'm going to show in the video, *the shots were supposedly going off on this end, which I say supposedly but they did go, because the gentleman did admit to firing a weapon….*

[Comments were made by the Court to witness to keep his focus on why he

arrested Coleman].

The decision was based on it because where the gentleman was standing, and the direction he was standing in. At the time in the video when you see the [victim] flinch, and it appears he is hit… where he was struck at, as was testified earlier with the forensic pathologist, along with the preliminary investigation... What Dr. Peretti said is that once is that once the bullet entered, which way it went….

Q: Where's Mr. Benton?
A: Mr. Benton is right here standing, sir….
Q: [I]s [Mr. Benton] directly at the grate or is he a little bit further away from it?
A: He's a little bit further away from it. Not very far. *It's hard to determine, of course, because of the way the video looks*, but he's just a couple a feet away from where he's at….
Q: And Mr. Coleman?
A: *I'd have to go over it a few more times….Mr. Coleman is one of these individuals here. There's another individual possibly right here. It's hard to determine which one is but you'll see the second scene….*
Q: All right. You've reviewed this video a number of times?
A: That's correct….
A: …We went by that time as we broke this video down almost frame by frame, if you will. Here in just a second,

8

*it's going to be hard to see but we'll have to play it a few times, from Mr. Coleman and from also the placement where he admitted to being there and also admitted to shooting the gun…Right up in this are here, …you're going to see some smoke come from a weapon being fired…Right there is Mr. Coleman when you see the gun being fired…you have to watch it several times. Again, from his testimony and him admitting to firing the gun a couple of times, it's very hard to see and difficult to see and he's actually, he's almost like jumping backwards, moving backward…*

Q:     All right. So again, my original question was why was Devontae Coleman arrested for this and not Jaylon Brown?

A:     After looking at the video, Your Honor, as many times as we did, after contacting the forensic pathologist and *getting where the bullet actually entered the victim and the trajectory once it was inside the body, the direction of where it went*, and the placement of Mr. Junius Benton, where he was actually standing at the time that [Coleman] fired the gun, *it was apparent to us at that time that that was one of the two bullets that struck [the victim's] body where it was closest. He was facing in a direction that was due east. When he appears in the video to duck down, if you saw where he kind of flinched and ducked down, then he started to spin a little bit, it was at that point in time we believe he was struck by the bullet*…. Jaylon was on that far south end of the street that if I stand, if I may stand again, the basis of determination was made on close to where [the victim] was standing east, if I'm here…

The defense attorney objected, urging that Det. Fendall was not an expert in the trajectory of a bullet; in fact, this objection was made several times during the detective's testimony. At that point, the trial court noted that the video speaks for itself.

On cross-examination, Det. Fendall stated that Coleman, in his statement, told them that he fired his gun into the air that day. Also, Det. Fendall testified that he arrested Coleman for attempted second degree murder and second degree murder in connection with this case. When asked who it was that Coleman was alleged to have attempted to murder, Det. Fendall admitted that Coleman had been charged with attempting to murder Jaylon

9

Brown based on Coleman's position around the time of the victim's shooting. Defense counsel asked to see a copy of the warrant or booking affidavit for that charge, but was not in the prosecution's court file. In defending the charge, Det. Fendall testified, "it was hard to determine how many people were actually out there so we were going to charge for—there's no doubt that the intent was to shoot downrange on the south end, *per se*, so that's where— if I recall correctly, that's where the determination was from." When asked to point Coleman out again on the video, or whether he needed to look at it again, Det. Fendall answered:

> "Yeah. I mean I was—where he was pointing the gun at. Where he told me he placed—where he--…I pointed him out earlier…

[The video is brought back up on the screen to 18:49].

> …If you watch right here, an arm goes up right there. *That's believed to be Mr. Coleman right there walking away and firing….that's Mr. Coleman. Based on his statements to us, he fired the gun two times **where he was standing near the victim**. That's correct….The determination of that gentleman being your client was based upon the statements that others made and himself….I can see a not his face per se, as in everything about his face, but I see his body that is a human being.*

Regarding witness statements, defense counsel asked Det. Fendall how many witnesses he had interviewed. In addition to Kendrix, Sears, and Isaiah Rucks, Det. Fendall also spoke with Jaylon Brown, Derrick Brown, Japhares Rucks, Devontae Coleman, Demarquez Coleman, Jamar Anderson, and Joe Lowery. He acknowledged that two of the three lay witnesses who testified at trial, Isaiah Rucks and Freddy Kendrix, testified that the victim told them that Jaylon Brown shot him. Det. Fendall also acknowledged that the three bullet casings were not taken to the crime lab for testing, and *the two weapons that were tested* were not test fired until the week before trial.

10

The defense rested without putting on any evidence. As noted above, the trial court took the matter under advisement, and made its ruling subsequently, which was the entry of a verdict of guilty of negligent homicide on April 12, 2021. Thereafter, the judge sentenced Coleman to imprisonment at hard labor for three years, with credit for time served, on July 2, 2021. Coleman appeals his conviction, urging insufficiency of the evidence.

## DISCUSSION

### *Defendant's Argument*

According to Coleman, the evidence presented by the State at trial was insufficient to support his conviction of negligent homicide beyond a reasonable doubt. Coleman notes the following testimony in support of his assignment of error.

Freddy Kendrix testified that J.D. Sears told Jaylon Brown to shoot him in the face. Jaylon pulled out a gun and fired it. Kendrix ran, and as he did, he saw Jaylon running and continuing to shoot his gun. Kendrix testified that as they tended to the injured June Bug, he kept repeating, "Jaylon shot me. Jaylon shot me." Isaiah Rucks, who described the victim as a brother, also testified that Benton stated, "I'm hit. I'm hit. Jaylon hit [me]. Jaylon hit [me]" immediately upon getting shot.

Detective Fendall, however, simply from watching the surveillance video, concluded that Coleman was guilty because of *where he believed* Coleman was standing at the time the detective *believed what he perceived to be* a "fatal flinch" by the victim was made. According to Det. Fendall, "the placement of Mr. Junius Benton, where he was actually standing at the time that Devontae [Coleman] fired the gun, it was apparent to us at that

11

time that that was *one of the two bullets*[2] that struck his body where it was closest.  He was facing in a direction that was due east.  When he appears in the video to duck down, if you saw where he kind of flinched and ducked down, then he started to spin a little bit, *it was at that point in time we believe he was struck by the bullet*."

Coleman contends that the importance of the physical reactions of the victim captured on video are critical to understanding Det. Fendall's "theory"—and his error.  Every witness recalled the sound of multiple gunshots fired, notes Coleman.  Kendrix testified that Jaylon pointed a gun at his face and fired.  Miraculously, Kendrix was not hit.  Just as Kendrix flinched at that first gunshot, others did likewise—including the deceased victim.  After the first shot, according to Kendrix's testimony, everyone scattered, with Coleman off to his left, running.  As Kendrix ran, he also saw Jaylon "was running, shooting with the gun at me."

Coleman posits that it is possible that the victim's initial "flinch and duck down" as depicted in the video was not a reaction to being shot, but was in response to the sound of Jaylon's first shot at Kendrix.  It is also possible that the "spin a little bit" was a reaction to the sound of continuing gunfire from Jaylon's gun as he continued to shoot at Kendrix as both men ran, or to the sound of the gunfire of Coleman shooting into the air, or maybe it was the victim's reaction to being hit.  What is important, though, is that between the sound of the first gunshot and those that followed, the first "flinch" and the next one, is that *everyone was moving*.  Unless it can be determined (which Coleman suggests is impossible) which "flinch" was in

---

[2] According to the testimony of Dr. Peretti, the victim was struck by a single bullet.

response to the shot that struck and killed the victim, Det. Fendall's "extrapolation from flinch back to the unseen muzzle of a gun" held by Coleman is a "hypothesis stacked upon speculation" made simply from the detective's viewing of a soundless grainy surveillance video. What this testimony is not, emphasizes Coleman, is evidence sufficient to support the verdict beyond a reasonable doubt.

Coleman concedes that there is evidence that he possessed a firearm at the scene. There is also evidence that Jaylon Brown, Japhares Rucks, and the victim were in possession of weapons at the time of the shooting. There is evidence that Coleman fired his weapon into the air. What is lacking, however, urges Coleman, is any evidence that he shot at a person, much less any evidence that his gunfire caused the victim's death. Coleman reiterates that from the beginning, Junius Benton identified his killer as Jaylon Brown, and the direct evidence at trial supported this identification. While one could speculate that Coleman fired the shot that killed the victim—the prosecutor did in his closing argument, and the trial judge did in rendering his verdict—the evidence simply is insufficient to support this conclusion, urges Coleman.

From a chaotic crime scene to untested casings to an unwilling crowd, there were some roadblocks the police in their investigation and the state in its prosecution had to work around to make their case. Nonetheless, the state's burden nonetheless remained the same—beyond a reasonable doubt. The evidence presented by the state fell short of the requisite burden, urges Coleman, and the trial judge's decision to find him guilty on the evidence presented was irrational and must be set aside by this Court.

*The State's Argument*

The trial judge, following a bench trial, found Coleman guilty of negligent homicide, which is defined by La. R.S. 14:32 as the killing of a human being by criminal negligence. The state notes that, at trial, Det. Mike Fendall with the MPD testified while narrating the video provided to police by the Housing Authority. Det. Fendall identified the victim, who was wearing a white shirt and standing near the drainage ditch. Det. Fendall pointed out smoke coming out of a gun believed to be Coleman's and the victim appearing to flinch after being struck by the bullet. According to the state, the "most damning evidence" against Coleman was that part of the video showing "puffs of smoke" followed by the victim's reaction.

The state concedes there was no evidence that Coleman intended to kill or inflict great bodily harm on the victim. But Coleman took a gun to the intersection of Long and Milliken on that date and shot at least twice in the direction of the victim. By firing into the crowd, urges the state, Coleman showed that he had the specific intent to kill or inflict great bodily harm upon "one person." That he accidentally killed the victim transfers that intent from the intended victim to the actual victim. Viewing these facts in the light most favorable to the prosecution, the evidence was sufficient to convict defendant of the crime charged (second degree murder) or, alternatively, the responsive verdict of negligent homicide as found by the trial court.

*Applicable Legal Principles*

In reviewing the sufficiency of the evidence to support a conviction for negligent homicide, an appellate court is controlled by the standard of review set forth by the Supreme Court in *Jackson v. Virginia,* 443 U.S. 307,

14

99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). *See State v. Desoto*, 2007-1804 (La. 3/17/09), 6 So. 3d 141. The appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proven beyond a reasonable doubt. *Id.*; *State v. Tate*, 2001-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004); *State v. Brown*, 52,266 (La. App. 2d Cir. 9/26/18), 256 So. 3d 431, 441–42, *writ denied*, 2018-1797 (La. 3/25/19), 267 So. 3d 597.

The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. *State v. Casey*, 1999-0023 (La. 1/26/00), 775 So. 2d 1022, *cert. denied*, 531 U.S. 840, 121 S. Ct. 104, 148 L. Ed. 2d 62 (2000); *State v. Harris*, 53,662 (La. App. 2 Cir. 1/13/21), 309 So. 3d 988, *writ denied*, 2021-00146 (La. 3/21/21), 312 So. 3d 589. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *Id.*; *State v. Robinson*, 50,643 (La. App. 2 Cir. 6/22/16), 197 So. 3d 717, *writ denied*, 2015-1479 (La. 5/19/17), 221 So. 3d 78; *State v. Gullette*, 43,032 (La. App. 2 Cir. 2/13/08), 975 So. 2d 753. The appellate court does not assess the credibility of witnesses or reweigh evidence. *State v. Smith*, 1994-3116 (La. 10/16/95), 661 So. 2d 442; *State v. Harris*, *supra*; *State v. Green*, 49,741 (La. App. 2 Cir. 4/15/15), 164 So. 3d 331.

Direct evidence provides proof of the existence of a fact, for example, a witness's testimony that he saw or heard something. *State v. Lilly*, 468 So. 2d 1154 (La. 1985); *State v. Harris*, *supra*; *State v. Coleman*, 52,074 (La.

App. 2 Cir. 11/14/18), 259 So. 3d 1203.  Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. *State v. Lilly*, *supra*; *State v. Harris*, *supra*; *State v. Mingo*, 51,647 (La. App. 2 Cir. 9/27/17), 244 So. 3d 629, *writ denied*, 2017-1894 (La. 6/1/18), 243 So. 3d 1064. When the state relies on circumstantial evidence to establish the existence of an essential element of a crime, the court must assume.  La. R.S. 15:438; *State v. Mingo, supra*.

The *Jackson* standard is applicable in cases involving both direct and circumstantial evidence.  *State v. Arnold*, 52,822 (La. App. 2d Cir. 8/14/19), 276 So. 3d 1097, 1110, *writ denied*, 2019-01693 (La. 6/24/20), 299 So. 3d 78; *State v. Mathis*, 52,500 (La. App. 2 Cir. 1/16/19), 263 So. 3d 613.  When the direct evidence is viewed, the facts established by the direct evidence and inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime.  *State v. Sutton*, 436 So. 2d 471 (La. 1983); *State v. Steines,* 51,698 (La. App. 2 Cir. 11/15/17), 245 So. 3d 224, *writ denied,* 2017-2174 (La. 10/8/18), 253 So. 3d 797.

In a bench trial, Louisiana law neither requires nor precludes a statement of reasons supporting the verdict returned by the court sitting as the fact finder in the case; however, if a trial judge chooses to do so, the statement of reasons may provide a useful guide to the appellate court for reviewing the sufficiency of the evidence under the *Jackson* standard. *Jackson v. Virginia, supra*; S*tate v. Marshall*, 2004-3139 (La. 11/29/06), 943 So.2d 362, *cert. denied*, 552 U.S. 905, 128  S. Ct. 239, 169 L .Ed. 2d 179 (2007); *State v. Thomas*, 50,898 (La. App. 2 Cir. 11/16/16), 209 So. 3d 234.

16

Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Allen*, 36,180 (La. App. 2 Cir. 9/18/02), 828 So. 2d 622, *writs denied*, 2002-2595 (La. 3/28/03), 840 So. 2d 566, 2002-2997 (La. 06/27/03), 847 So.2d 1255, *cert. denied*, 540 U.S. 1185, 124 S. Ct. 1404, 158 L.Ed.2d 90 (2004). The pertinent inquiry in bench trials remains, as it does in jury trials, on the rationality of the result and not on the thought processes of the particular fact finder. *State v. Marshall*, *supra*. The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. *State v. Casey*, 1999-0023 (La. 1/26/00), 775 So. 2d 1022, *cert. denied*, 531 U.S. 840, 121 S. Ct. 104, 148 L. Ed. 2d 62 (2000).

In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. Gullette, supra*; *State v. Burd*, 40,480 (La. App. 2 Cir. 1/27/06), 921 So.2d 219, *writ denied*, 2006-1083 (La. 11/9/06), 941 So. 2d 35.

La. R.S. 14:32(A)(1) provides that negligent homicide is the killing of a human being by criminal negligence. La. R.S. 14:12 provides:

> Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.

17

The provisions of former La. C. Cr. P. arts. 29-32 (now La. R.S. 14:32) dealing with homicide indicated the legislature's intent that negligent homicide should constitute an offense of a lesser grade than murder or manslaughter and be included in the latter two as a lesser offense. *State v. Desoto*, 6 So. 3d at 147, citing *State v. Stanford*, 204 La. 439, 15 So. 2d 817 (La. 1943). The offense of negligent homicide is not an intentional crime and intent is not an element of negligent homicide. *State v. Desoto*, *supra*; *State v. Guillot*, 277 So. 2d 146 (La. 1973).

*Analysis*

What the state proved in this case is that Coleman possessed a gun at the intersection and, by his own admission, fired his weapon twice. The evidence, particularly the video heavily relied upon by the state, however, fails to establish ***exactly who it was*** that fired the shot that struck and killed Benton. As did the investigating officers, this Court watched (a number of times, in fact) the video recording of the victim's shooting captured by the Housing Authority's camera. Det. Fendall's somewhat equivocal testimony as to the events depicted in the video, together with the other evidence of record, is not sufficient to bear the state's burden of proof that Coleman acted in an unreasonably dangerous or unsafe manner at the time of the discharge of his weapon (since there is insufficient proof as to when that was) ***and*** that this was the cause of the victim's death.

The judge's oral reasons in support of the Court's verdict show that, among other things, notwithstanding the expert testimony of Dr. Peretti as to the fact that Benton was shot from a distance, and that the bullet's path of travel was from the left to right side and downward, the judge placed undue

weight on Det. Fendall's interpretation and analysis of the events depicted in the video. The MPD failed to test the three bullet casings found at the scene of the shooting. The Taurus 9mm taken from Sears and Brown's home and the Ruger .380 retrieved from Japhares Rucks were not test-fired and compared to the bullet recovered from the victim[3] until the week prior to trial. While Det. Fendall stated that he relied on the statements of numerous eyewitnesses regarding Coleman's actions and location at the time of the victim's shooting, only two of them testified at trial. Furthermore, both eyewitnesses stated that, upon being shot, "June Bug" repeatedly claimed that it was Jaylon Brown who had shot him, even as he was being driven to the hospital. Taken altogether, this falls short of the evidence necessary to support a verdict of negligent homicide.

## CONCLUSION

For the reasons set forth above, the conviction and sentence of defendant, Devontae Demarquis Coleman, are reversed.

**REVERSED.**

---

[3] The .380 possessed by Japhares Rucks on the date of the shooting was not tested (actually, as noted previously, all the testimony says is that it was not collected); it is one of two weapons not recovered by MPD after the shooting, the other being Coleman's.