BLEICH, J. (Pro Tempore )
Following a jury trial in the Fourth Judicial District, Parish of Ouachita, State of Louisiana, the defendant, Cortez Coleman, was found guilty as charged of the second degree murder of Steve Brown. Coleman was sentenced to life imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence, and he now appeals his conviction. For the following reasons, Coleman's conviction and sentence are affirmed.
FACTS AND PROCEDURAL HISTORY
On April 18, 2013, deputies with the Ouachita Parish Sheriff's Office found Steve Brown lying on the ground outside an abandoned house at 202 Central Street in West Monroe, Louisiana. Brown had a *1206 gunshot wound to the head and was dead. Ultimately, officers learned from two eyewitnesses, Ashley Williams and Viktavia Franklin, that Brown had been shot by Cortez Coleman, who then fled into the nearby woods. Coleman was later arrested and indicted by a grand jury on the charge of second degree murder, in violation of La. R.S. 14:30.1.
Prieur Hearing
On January 14, 2015, the state filed a notice of intent to use other crimes evidence under La. C.E. art. 404(B)(1) and a motion for a Prieur hearing, in accordance with State v. Prieur , 277 So.2d 126 (1973). Specifically, the State sought to introduce evidence that on June 9, 2011, Coleman and a friend, DeKendrick Patterson, conspired to lure Henry Lyons to a remote location in order to rob him of his 1996 Chevrolet Caprice and rims, and then shot Lyons multiple times before stealing his vehicle. The State asserted that the purpose of using said other crimes and/or wrong acts was to show Coleman's pattern of conduct, identity, absence of innocent intent, motive, plan and preparation, and to negate any claim of mistake or accident. These "other crime" facts were similar to the facts in the current case, in which the State alleged that Coleman conspired with his girlfriend to lure the instant victim, Brown, to a remote location in order to rob him of his 1996 Chevrolet Impala and rims, and shot and killed Brown.
On July 8, 2015, the parties appeared before the trial court for arguments on the State's Prieur motion. Officer John Martin, who was a major crime investigator with the East Carroll Parish Sheriff's Department on June 9, 2011, testified that he responded at 1:45 a.m. to the East Carroll Parish Hospital to interview a shooting victim named Henry Lyons. Officer Martin testified in detail about the series of events Lyons described to him, leading up to Coleman shooting him in the leg and hand and stealing Lyons' vehicle. Coleman and his accomplice, Patterson, drove off in Lyons' vehicle, leaving Lyons in the ditch. According to Ofc. Martin, Lyons believed that Coleman wanted to get the rims on Lyons' vehicle, which was later found abandoned on I-20 West in Richland Parish. The rims were still on the vehicle, but the vehicle was completely out of gas.
Officer Martin testified that arrest warrants were issued for both Coleman and Patterson. Patterson surrendered two days after the incident. Officer Martin interviewed Patterson, who confirmed Lyons' story. Officer Martin testified that Patterson told him that he and Coleman planned to convince Lyons to give them a ride and then rob him of the rims on his vehicle.
Officer Martin testified that Coleman was apprehended three months later and charged with attempted murder and carjacking. Coleman declined to give a statement to officers and posted a bond. When Coleman failed to appear at the next scheduled court date, a bench warrant was issued for his arrest. For unknown reasons, the warrant was not entered into the National Crime Information Center database.
The state asserted that the evidence of the 2011 offenses and Lyons' prior identification of Coleman as the shooter and carjacker were admissible to establish Coleman's intent to rob Brown of his vehicle and rims and to negate Coleman's claim that he accidentally shot Brown. On October 21, 2015, the trial court granted the motion and ruled that testimonial evidence of the 2011 offenses and the victim's identification of Coleman as the perpetrator were admissible at trial.
Trial of the Matter
The evidentiary portion of the trial in this matter began on July 21, 2016, wherein *1207 numerous witnesses testified, as will be discussed herein. In connection with the others crimes evidence against Coleman, which had been the subject of the previous Prieur hearing and which the trial court had determined could be introduced at trial, Lyons was called to testify. However, once on the witness stand, Lyons asserted that he had been drinking on June 9, 2011, and was under the influence of alcohol when interviewed by Ofc. Martin. At trial, he claimed no recollection of Coleman shooting him, how he ended up in the hospital with two gunshot wounds, or how his vehicle was stolen. Lyons admitted that he knew Coleman but denied having told Ofc. Martin anything regarding Coleman being the person who shot him and stole his vehicle.
Defense counsel objected when the State attempted to impeach Lyons' testimony with trial testimony by Ofc. Martin, arguing that when a non-party witness's credibility is attacked through prior inconsistent statements incriminating the accused, the evidence is generally not admissible for its assertive value as substantive evidence of guilt. The trial court ruled that Ofc. Martin's testimony regarding Lyons' prior statement was inadmissible-effectively denying the use of the State's other crimes evidence against Coleman.
The State filed an emergency request for supervisory review, and this court reversed the trial court, citing State v. Johnson , 99-3462 (La. 11/03/00), 774 So.2d 79, which held that an exception to this general rule exists for cases in which the witness's prior inconsistent statement also constitutes a prior statement of identification for purposes of La. C.E. art. 801(D)(1)(c). Accordingly, this court ordered the trial court to allow Ofc. Martin's testimony in order to impeach Lyons' trial testimony denying that he made the statements identifying Coleman as the 2011 perpetrator and as substantive evidence that Coleman committed the prior similar offense. State v. Coleman , 51,178-KW (La. App. 2 Cir. 07/25/16).
Despite this court's ruling, defense counsel again challenged Ofc. Martin's testimony about Lyons' prior inconsistent statement by filing a motion for mistrial pursuant to La. C. Cr. P. art. 770(2) on July 26, 2016. While acknowledging that Ofc. Martin's testimony was admissible as evidence that Lyons previously identified Coleman as the 2011 perpetrator, Coleman's motion for mistrial argued that Officer Martin's testimony about Lyons' statement was inadmissible for the purposes of establishing that Coleman shot and robbed Lyons for the purpose of taking Lyons' rims. The trial court denied the motion for mistrial based on the previous ruling on the emergency writ.
After the State rested, the trial court conducted a colloquy with Coleman regarding his rights, and Coleman exercised his constitutional right to remain silent. The defense rested and each side gave closing arguments. A unanimous jury found Coleman guilty as charged of second degree murder. A presentence investigation report was ordered for sentencing. No post-trial motions were filed.
At a sentencing hearing, the trial court reviewed the facts of the case and aggravating and mitigating factors. Coleman declined to make any statement at sentencing. The trial court imposed the mandatory sentence of life imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence. Coleman was advised of the time period within which to seek post-conviction relief.
Coleman filed a motion to reconsider sentence; however, the trial court denied the motion. Coleman sought an "out-of-time" appeal, which was granted, and this appeal ensued.
*1208 DISCUSSION
Sufficiency of the Evidence
In his first assignment of error, Coleman argues that the State failed to present sufficient evidence to support the verdict of second degree murder.[1] Coleman takes issue with the witness testimony considered by the jury. He specifically argues that Williams' testimony was unreliable because she was also charged with a crime in this offense and asserts her testimony was self-serving. Coleman maintains that Williams' testimony is less credible because she initially lied to the officers and told them divergent versions of events on the night in question. Coleman also argues that Franklin's testimony was less credible because she did not describe Steve Brown's shooter. We disagree.
Legal Principles
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) ; State v. Tate , 01-1658 (La. 05/20/03), 851 So.2d 921, cert. denied , 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004) ; State v. Bass , 51,411 (La. App. 2 Cir. 06/21/17), 223 So.3d 1242, writ not cons ., 18-0296 (La. 04/16/18), 239 So.3d 830. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford , 05-0477 (La. 02/22/06), 922 So.2d 517 ; State v. Dotie , 43,819 (La. App. 2 Cir. 01/14/09), 1 So.3d 833, writ denied , 09-0310 (La. 11/06/09), 21 So.3d 297, 12-0717 (La. 09/12/12), 98 So. 3d 305.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton , 436 So.2d 471 (La. 1983) ; State v. Norman , 51,258 (La. App. 2 Cir. 05/17/17), 222 So.3d 96, writ denied , 17-1152 (La. 04/20/18), 240 So.3d 926
Direct evidence provides proof of the existence of a fact, for example, a witness's testimony that he saw or heard something. State v. Lilly , 468 So.2d 1154 (La. 1985) ; State v. Baker , 49,175 (La. App. 2 Cir. 08/27/14), 148 So.3d 217. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Broome , 49,004 (La. App. 2 Cir. 04/09/14), 136 So.3d 979, writ denied , 14-0990 (La. 01/16/15), 157 So.3d 1127. For a case resting essentially upon circumstantial evidence, that evidence must exclude every reasonable hypothesis of innocence. State v. Christopher , 50,943 (La. App. 2 Cir. 11/16/16), 209 So.3d 255, writ denied , 16-2187 (La. 09/06/17), 224 So.3d 985.
*1209 The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith , 94-3116 (La. 10/16/95), 661 So.2d 442 ; State v. Walker , 51,217 (La. App. 2 Cir. 05/17/17), 221 So.3d 951, writ denied , 17-1101 (La. 06/01/18), 243 So.3d 1064. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Brown , 51,352 (La. App. 2 Cir. 05/02/17), 223 So.3d 88, writ denied , 17-1154 (La. 05/11/18), 241 So.3d 1013.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Ward , 50,872 (La. App. 2 Cir. 11/16/16), 209 So.3d 228, writ denied , 2017-0164 (La. 09/22/17), 227 So.3d 827. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Hust , 51,015 (La. App. 2 Cir. 01/11/17), 214 So.3d 174, writ denied , 17-0352 (La. 11/17/17), 229 So.3d 928. The trier of fact is charged to make a credibility evaluation and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Sosa , 05-0213 (La. 01/19/06), 921 So.2d 94 ; State v. Hust, supra .
Louisiana R.S. 14:30.1 defines second degree murder, in pertinent part, as the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated or first degree rape, forcible or second degree rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, assault by drive-by shooting, armed robbery, first degree robbery, second degree robbery, simple robbery, cruelty to juveniles, second degree cruelty to juveniles, or terrorism, even though he has no intent to kill or to inflict great bodily harm.
Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the proscribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). As a state of mind, specific intent need not be proven as a fact, but may be inferred from the circumstances of the offense and the defendant's actions. State v. Allen , 41,548 (La. App. 2 Cir. 11/15/06), 942 So.2d 1244, writ denied , 07-0530 (La. 12/07/07), 969 So. 2d 619. All that is necessary is that the defendant form the specific intent to kill or inflict great bodily harm for an instant when committing the crime. State v. Williamson , 27,871 (La. App. 2 Cir. 04/03/96), 671 So.2d 1208, writ denied , 96-1143 (La. 10/04/96), 679 So.2d 1380.
Specific intent may be inferred from the circumstances of the offense and the defendant's act of deliberating pointing a gun and firing it at a person. State v. Patterson , 50,305 (La. App. 2 Cir. 11/18/15), 184 So.3d 739, writ denied , 15-2333 (La. 03/24/16), 190 So.3d 1190.
Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. La. R.S. 14:30.1(B).
Trial Testimony: Investigation
Officers Miranda Rogers, Michael McLain, and James Humphrey (the "responding officers"), all of the Ouachita Parish Sheriff's Office ("OPSO"), each testified *1210 that on April 18, 2013, they responded to a 911 call that a man had been shot on Central Street in West Monroe. In the driveway of an abandoned house of a corner lot at 202 Central Street, the responding officers described finding a dark-colored Chevrolet Malibu, and parked behind it, a red 1996 Chevrolet Impala, with the driver's side door ajar. Officers McLain and Humphrey testified that the area was still very dark and dimly lit. Officer Humphrey testified that there was not a lot of foot traffic in the area, most of the existing homes were vacant, and there were several empty lots where trailers had been removed. The responding officers testified that, on the ground next to the Impala, they found a deceased black male with gunshot wounds to the head and right shoulder. Also at the scene, standing in the roadway, were four individuals: Ashley Williams, Viktavia Franklin, Michelle Mooney, and Jessie Cuerto.
Two of the young women identified themselves to the responding officers as Viktavia Franklin and Ashley Williams. The responding officers testified that Williams gave them a statement about the shooting. She acknowledged to them that the deceased man's name was Steve Brown, whom she had arranged to meet on Central Street. Initially, she related to them that a man approached her and Brown, pulled out a gun, and demanded that Brown give him his keys. Brown refused to give the man the keys, and instead pleaded with him. Brown then grabbed Williams and put her between him and the armed man. Williams struggled with Brown and managed to break free by removing her shirt. The armed man then pulled out a roll of duct tape and ordered Williams to tape Brown's hands. As she attempted to tape his hands, Brown broke free and ran to his vehicle, with the armed man chasing behind him. The armed man shot Brown as he was trying to get to his car.
The responding officers testified that Franklin also gave them a statement, which was largely corroborative of Williams' statement. Williams had been texting with Brown, and she made arrangements to meet him at the Central Street location. Franklin remained in Williams' car while Williams and Brown chatted outside. Franklin then saw Brown arguing with a man, who pointed a gun at Brown. Franklin saw Brown pull Williams in front of him, and then saw Williams trying to duct tape Brown's hands. Franklin said that when Williams broke free, Brown turned and ran toward his car. Franklin then heard a gunshot.
Officer Renee Smith of the OPSO testified that it was still dark outside at approximately 2:30 a.m. when she arrived at the crime scene with the crime scene investigation unit. Officer Smith photographed the crime scene, including the blood-splattered Impala later determined to be the victim's. Officer Smith's pictures show Brown lying on the ground next to his vehicle in a pool of blood. Brown had a piece of duct tape stuck to one hand, and his t-shirt was stuck in a gunshot wound to his shoulder. Officer Smith also photographed a bullet and a used .40 caliber shell casing that were found in the grass near the victim. Brown's cell phone was also collected as evidence.
Ofc. Humphrey testified, after he arrived at the scene, he was informed by Ofc. Rogers about the details she had gathered from Williams and Franklin regarding the shooting. Officer Humphrey testified that initially, several details of the women's story did not make sense to him. He was skeptical of Williams' claim that an unknown armed robber would try to get her to help by binding Brown with duct tape. Officer Humphrey was also skeptical about Williams' claim that she and Brown planned to meet at the location on Central *1211 Street, and that someone just "randomly" happened to walk by, in an area of vacant houses with no foot traffic, at that time to rob them. At the scene, Ofc. Humphrey placed Williams and Franklin in separate patrol vehicles and confiscated their cell phones. After Franklin was read her rights, she informed Ofc. Humphrey that the shooter was Williams' boyfriend. When Ofc. Humphrey informed Williams of her rights, she agreed to speak to him. Williams reiterated her claim that she did not know the shooter. Officer Humphrey instructed the other officers to take Franklin and Williams to the station, but with strict instructions to keep them separated. At the station, the women were again read their rights, and they were interviewed separately. Franklin repeated that the shooter was "Ashley's boyfriend." When Williams was confronted with Franklin's admission, she admitted that Coleman was the shooter. At the time, Williams maintained that she had no involvement in the shooting.
Officer Humphrey testified that later that morning, Williams' cell phone rang, and she was allowed to answer it on "speaker" setting. Officer Humphrey testified that the caller identified himself as "Capone," and said that he needed to be picked up from an attorney's office. Williams told the officers that "Capone" was a name that Coleman called himself, and she identified the caller as Coleman. Officer Jason Pleasant of the OPSO testified that he located Coleman at the attorney's office, where Coleman was arrested. Coleman's phone was seized. Officer Humphrey obtained search warrants for the cell phones and cellular service providers of all the cell phones collected.
Officers Humphrey and Bryan Boney conducted the initial unrecorded interview with Coleman. Both officers testified that Coleman denied knowing Brown or Williams and claimed that he had stayed with a friend the night before. Subsequently, Ofc. Pleasant spoke briefly with Coleman and informed him that police had other witnesses who were willing to testify about the shooting, and officers really wanted to hear his version of the incident. In response to Ofc. Pleasant's request, Coleman agreed to give a statement.
Officer Johnny Holyfield testified regarding Coleman's formal statement, and a video recording of the statement was played for the jury. In this recorded statement, Coleman claimed initially that the plan was devised by "the girls," but later stated that it was a setup planned by him and Williams because Coleman wanted to get money to get a friend out of jail. Coleman said that the plan was to get Brown's car keys and take his car. Coleman related that Williams had been texting with Brown after discovering him on a dating website. According to Coleman, he and Williams then created a "fake" page so they could continue talking to Brown and make arrangements to meet him. Coleman claimed that he got the gun and the duct tape from Williams and Franklin, who picked him up that day. Coleman said that once the meeting was arranged, Williams switched vehicles so that she was driving her brother's Malibu. Williams dropped Coleman off several streets away from Central Street. Coleman recounted that he and Williams continued texting once Brown arrived. Coleman told the officers that he was scared, and he had never done anything like that before. Coleman admitted that he walked up and asked Brown about his car, then pointed a gun at Brown and demanded the keys. Coleman confirmed that he ordered Williams to duct tape Brown's hands, but Brown broke free and grabbed Williams like a shield. Coleman said that Brown then shoved Williams into him, causing them both to fall. Coleman related that as he fell, the gun he was holding discharged, and Brown was hit.
*1212 Coleman said that he saw Brown on the ground, grabbed his gun, and ran off. Coleman told the officers that he left the gun wrapped in his shirt on top of a filing cabinet at the attorney's office. In his statement, Coleman claimed repeatedly that Brown was accidentally shot when the gun inadvertently discharged when dropped.
Officer Humphrey testified that the deputies were able to retrieve the gun, which was a .40 caliber Hi-Point semi-automatic pistol, and it was sent for testing at the crime lab. He further testified that the gun was not fingerprinted or swabbed for DNA because Coleman admitted that it was the gun used during the attempted armed robbery and shooting.
Officer Humphrey also testified that text messages retrieved from the cell phones confirmed Williams' involvement in planning the robbery and that Williams and Coleman were exchanging texts after Brown arrived and before Coleman walked up. Officer Humphrey also testified that, with the text messages retrieved, the officers were able to confirm testimony that Franklin's phone was used to lure Brown to the site to meet someone named "Brandy."
Trial Testimony: Forensic Evidence
Dr. Frank Peretti was accepted as an expert in forensic pathology and the classification of gunshot wounds. Dr. Peretti testified that he performed Brown's autopsy and concluded that the cause of death was a perforating gunshot wound to the left side of the victim's head that then exited the skull and entered the victim's right shoulder. The autopsy photographs show the entry gunshot wound was to the left temple area. Dr. Peretti testified that the "distant" entry gunshot wound was consistent with being made from over two feet away. Dr. Peretti testified that the shape of the gunshot wound to the head was inconsistent with Coleman's explanation that the gun discharged as he fell or when the gun hit the ground. Dr. Peretti testified that the round and circular entrance wound shape indicated that the shot to the head was straightforward and perpendicular, which was inconsistent with the oblong wound shape that would result from the gun being fired at an angle at or near the ground.
Troy Kendall Stracener with the North Louisiana Crime Lab was accepted as an expert in firearms identification and examination. Stracener testified that he received the gun, which had eight .40 caliber bullets in the magazine. He test-fired the gun using ammunition matching the type of ammunition found at the crime scene. Stracener testified that he determined that the bullet and casing found at the crime scene were fired from the gun that Coleman said he used during the attempted armed robbery and shooting (and that was found at the attorney's office where he said he left it).
Officer Larry Ludlow testified that he tested Williams' hands for gunshot residue, and the results indicated that she was nearby when a gun discharged or that she touched something with gunshot residue but that she did not actually fire a gun herself. Officer Ludlow testified that Coleman's hands were not tested for gunshot residue because, when officers found him at the attorney's office, he had just washed his hands, which would have washed away any gunshot residue.
Trial Testimony: Witnesses
Franklin also testified at trial. According to Franklin, at the time of Brown's murder, she was 17 years old and lived in Illinois, but was visiting in Monroe with family, including Williams, who was her cousin. Franklin related that she and Williams rode around town that day with Williams' boyfriend, Cortez Coleman. Williams drove, Franklin sat in the passenger *1213 seat, and Coleman sat in the back seat. Franklin related that Coleman talked about needing money in order to get his friend out of jail, and he talked about how much cars were worth. Coleman and Williams had been on a dating website, and as they drove around, Coleman recognized a vehicle that he had seen in someone's profile on the website. Williams and Coleman communicated with that person using Williams' cell phone (although Franklin testified she did not know who that person was at the time, the man is referred to herein by name-i.e. , Brown). Later on, they began to text Brown using Franklin's cell phone, and Williams arranged to meet Brown. Williams dropped Coleman at a gas station, drove around for about ten minutes and then returned to pick Coleman up. Franklin stated that Williams then switched vehicles with her brother, who owned a black Chevrolet Malibu. Next, Williams dropped Coleman in a neighborhood and then drove over and parked in the driveway of an abandoned house on Central Street. Williams then began texting on her phone. When Franklin asked why they were waiting there, she said that Williams told her they were waiting for Coleman.
Franklin described Brown (whom she claimed not to know) pulling up into the driveway behind them in a red car where he sat for a few minutes while Williams continued texting on her phone. According to Franklin, Brown eventually got out and walked up to Williams' car window, and then he walked over to Franklin's side of the car and got in on the rear passenger side. After ten minutes of chatting inside the vehicle, Williams and Brown stood outside the car and continued talking. Another man, whom Franklin said he did not recognize but turned out to be Coleman, then approached Williams and Brown. Franklin, who was still sitting in the car, estimated that the second man was 5' 5? tall. This second man, Coleman, asked for a cigarette, and he also asked who owned the red car. Franklin said that Brown responded that he had no cigarette, and the red car belonged to him. Coleman demanded Brown's keys, and Brown refused. Then Coleman pulled a gun from his waistband and Franklin heard a "clicking" sound. According to Franklin, Coleman pointed the gun at Brown. Franklin said that she screamed, and Coleman turned and pointed the gun at her and told her to shut up. Brown then grabbed Williams and used her as a shield. Coleman pulled a roll of duct tape from his pocket and demanded that Williams tape Brown's hands, but she refused. Franklin said Brown pleaded with Coleman before being shot, but Coleman insisted that Brown give him the keys. Franklin also said that Coleman told Brown to get in the trunk of his car and ordered Williams to tape Brown up, but Brown refused to get into the trunk. Williams then tried to tape Brown's hands, but he broke free, ran to his car, and opened the car door. According to Franklin, Coleman chased Brown. Franklin heard a gunshot and Williams screamed. Then Franklin saw Coleman run into the woods.
Franklin testified neither she nor Williams could find their phones, so they used the neighbor's phone to call 911. Franklin described the shooter as being short, with baggy clothes, and a hoodie. Franklin testified that she did not initially recognize Coleman as the shooter because she had only met him for the first time that day, and at the time of the shooting, it was very dark outside. Franklin testified that after the man ran into the woods, Williams told her that the shooter was Coleman. Franklin insisted that she did not know of any plan to rob Brown.
Williams testified at trial to the following. She was 21 years old at the time of the shooting; Williams admitted that she *1214 lied to the responding officers when she said she did not know the identity of the shooter; and, she lied when she gave a description to the 911 operator and the responding officers. Williams also admitted that she knew that Coleman was planning to rob Brown. Williams confirmed that she had been arrested and had pending charges for second degree murder and conspiracy to commit second degree murder, but said that she had no deal with the State in exchange for her testimony.
Williams testified that she had been dating Coleman about two months at the time of the shooting. According to Williams, Coleman always had a gun with him, and he called himself "Capone." Williams testified that Coleman had seen on Brown's dating website profile that Brown owned a red 1996 Chevrolet Impala, and Coleman wanted to steal the rims from Brown's car to help Coleman get his friend "Big Meat" out of jail. Williams testified that Coleman instructed her to contact Brown via the dating website so that they could set Brown up. Williams and Brown exchanged phone numbers and began texting. Williams confirmed that she, Franklin, and Coleman were riding around that day, and Coleman began texting Brown using Franklin's cell phone. Williams testified that she dropped Coleman off and then parked at Central Street to wait for Brown to arrive. Williams said that she was still texting with Coleman after Brown arrived that night, with Coleman telling her to get Brown out of the car. Brown walked around and got into the rear passenger side seat behind Franklin and began talking to them. Williams testified that Coleman then arrived at the site and demanded Brown's keys. When Brown refused Coleman's demand for the keys, Coleman threw the duct tape to her and ordered her to tape Brown up. Williams testified that, when Brown grabbed her like a shield, they struggled and somehow her shirt came off and she broke free of him. According to Williams, she ran off and turned to see Brown running to his car with Coleman chasing him. Williams testified that when Brown opened his car door, Coleman shot him. Then Coleman ran, and yelled "come on" at Williams and Franklin.
Michelle Mooney and her boyfriend Jesse Cuerto lived next door on the intersecting street of West Ransom Street.[2] Mooney testified that she and Cuerto were woken up by the sounds of their dogs barking and people arguing, all of which were followed by a gunshot. Mooney testified that when she came outside, she saw an unknown black male running by-he yelled that his friend had been shot. Mooney then saw two young women come around the corner into the intersection, and they asked to use Mooney's phone to call 911. Mooney could not recall at trial the description that the woman who called gave of the man to the 911 operators.
Trial Testimony: Other Crimes Evidence
As explained herein, following a pretrial Prieur hearing, the trial court determined that evidence of Coleman's other crimes could be introduced at trial. In that vein, the state called Henry Lyons, the alleged victim of a shooting involving Coleman. Lyons claimed at trial that he had no memory of Coleman shooting him because he was intoxicated. In response, Ofc. Martin testified that on June 9, 2011, he found Henry Lyons in the East Carroll Hospital emergency room where he was being treated for two gunshot wounds. Officer Martin stated that Lyons did not appear to be under the influence of alcohol, did not smell of alcohol, did not slur his words, and did not have dilated pupils. Ofc. Martin stated that Lyons exhibited a normal and coherent demeanor, spoke clearly and distinctly, *1215 and appeared to understand all of the officer's questions. Lyons told Ofc. Martin that Coleman and his friend asked Lyons for a ride out to the dam so they could look for a bag. Once they got to the dam, the three men searched the area. Lyons related to Ofc. Martin that Coleman then pulled out a gun and began firing at Lyons. Some of the shots missed Lyons, but one struck him in the left knee. Lyons told the officer that, as he attempted to run away, Coleman shot him in the left hand. Lyons described that Coleman drove off in Lyons' burgundy 1996 Chevrolet Caprice. Lyons told the officer that he has 26-inch chrome rims on the vehicle, and he believed that Coleman wanted these rims. Officer Martin testified that the car was found abandoned with all four rims still intact, but with an empty gas tank. Officer Martin testified that Coleman was arrested three months later and charged with attempted murder and carjacking. An arrest warrant was issued when Coleman failed to appear for court on those charges, but the warrant was inadvertently not entered into the system so authorities were not alerted to search for Coleman on the 2011 charges.
Analysis
The evidence presented by the State in this case was sufficient to establish that Coleman was guilty of killing someone during the attempted commission of an armed robbery, in violation of La. R.S. 14:30.1. First, we consider Coleman's recorded statement to police, wherein he made several key admissions. Coleman admitted that he saw the car Brown owned and he conspired to commit armed robbery of the victim by taking his vehicle; he conspired with Williams to set Brown up so he would believe he was meeting a woman, and the pair worked to lure Brown to the vacant house on Central Street; he pointed a gun at Brown and demanded his keys and then tried to have Brown bound in duct tape; he needed money; and, Brown was shot with the gun that Coleman was using to rob him.
Second, the evidence refutes Coleman's description of the actual shooting, of which evidence was overwhelming. In his recorded statement, Coleman claimed that the gun discharged when he dropped it from his side. Most compelling to refute Coleman's claim is the forensic evidence. As explained in expert testimony by the forensic pathologist, Coleman's assertion that the gun discharged accidentally was not supported by the objective, scientific evidence as to the shape of the gunshot wound to Brown's head. Furthermore, this assertion that the gun discharged accidentally, based on Coleman's claim that Brown shoved Williams into Coleman, was inconsistent with the testimony of both Williams and Franklin-a reasonable credibility call clearly within the jury's discretion. Both Williams and Franklin testified that Brown attempted to escape by running to his vehicle and Coleman ran after him "with the gun." Then Coleman shot Brown. Thus, the witness accounts and the forensic evidence support a conclusion that Coleman intentionally shot Brown rather than that the shooting being inadvertent and accidental as described by Coleman.
Third, the facts surrounding the incident were confirmed by Williams, a participant and witness to the crime, and Franklin, a witness to the crime. Although there were obvious discrepancies in the women's initial statements to police and their trial testimony, there were no discrepancies in the essential facts establishing and supporting the charge that Coleman killed Brown during an attempted armed robbery. The testimony of Williams and Franklin at trial, despite some minor inaccuracies, was believable and sufficient to lead to the factual conclusion that Coleman committed the charged offense. Mooney, another witness at the scene, confirmed *1216 that she saw Coleman running away from the scene.
Finally, the admitted evidence indicated the shooting of Lyons was purposeful, and it buttressed the additional evidence that, in the killing of Brown, Coleman acted with intent, preparation, plan, and knowledge, and that the shooting was not an accident. Officer Martin recounted that Lyons described to him how Coleman lured him to a remote location, shot him numerous times, and stole his car with specialty rims-an uncanny harbinger of the incident leading to Brown's death. Clearly, the other crimes evidence tends to refute Coleman's claim that Brown was shot unintentionally, supporting the already significant evidence proving Coleman's guilt.
Thus, after viewing the evidence in the light most favorable to the prosecution, we find that the jury could have reasonably concluded that the essential elements of the crime for which Coleman was charged, i.e. , the second degree murder of Steve Brown, were proven beyond a reasonable doubt. This assignment is without merit.
Other Crimes Evidence
In his second assignment of error, Coleman states the trial court erred by allowing evidence of other crimes, acts, or wrongs. Specifically, he argues that the trial court erred in allowing trial testimony by Ofc. John Martin, already described herein, about a prior identification made by a victim, Henry Lyons, who identified Coleman as the person who shot him and stole his car in 2011. Coleman argues that Ofc. Martin's testimony was inadmissible because at trial, Lyons testified that he could not recall who shot him and because the 2011 charges were never proven. Further, Coleman asserts that the prejudicial effect of this other crimes evidence was not outweighed by the probative value of the evidence. We disagree.
Legal Principles
Courts may not admit evidence of other crimes to show the defendant as a person of bad character who has acted in conformity with his bad character. La. C.E. art. 404(B)(1) ; State v. Rose , 06-0402 (La. 02/22/07), 949 So.2d 1236 ; State v. Howard , 47,495 (La. App. 2 Cir. 11/14/12), 106 So.3d 1038.
The seminal case governing other crimes evidence, State v. Prieur, supra , has recently been amplified by the Louisiana Supreme Court's opinion in State v. Taylor , 16-1124, 16-1183 (La. 12/01/16), 217 So.3d 283. The court reaffirmed the majority of principles set forth in Prieur and its progeny and reiterated that La. C.E. art. 404B(1) governs the admissibility of other crimes, wrongs, or acts, provided that the prosecution establishes an independent reason for its admission, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake. Even when the evidence is offered for a purpose allowed under Article 404B(1), it must have substantial relevance independent from showing the accused's criminal character and is not admissible unless it tends to prove a material fact at issue or to rebut a defendant's defense. See State v. Taylor , supra at 292 ; State v. Colby , 51,907 (La. App. 2 Cir. 05/30/18), 244 So.3d 1260, 1272.
The trial court, in its gatekeeping function, must determine the independent relevancy of the evidence and balance the probative value of the prior bad acts evidence against its prejudicial effects before the evidence can be admitted. Huddleston v. United States , 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988) ; State v. Miner , 17-1586 (La. 01/04/18), 232 So.3d 551 ; State v. Taylor, supra ; State v. Colby, supra ; see also , La. C.E. art. 403.
*1217 A trial court's ruling on the admissibility of other crimes evidence will not be overturned absent an abuse of discretion. State v. Parker , 42,311 (La. App. 2 Cir. 08/15/07), 963 So.2d 497, writ denied , 07-2053 (La. 03/07/08), 977 So.2d 896.
Analysis
On appeal, Coleman does not take issue with the trial court's pretrial determination of admissibility of evidence regarding Coleman's incident with Lyons, evidence tending to point to his intent, motive, preparation, plan, identity, and lack of accident in this case. Thus the issue faced by this court is not regarding the evidentiary standard applicable to the pretrial hearing, but the introduction of evidence at trial regarding Coleman's other crime and its applicability to the offense at hand. In other words, once the trial court determined at the pretrial Prieur hearing that the other crimes evidence against Coleman was admissible, was that evidence properly admitted during trial?
The state attempted to introduce the evidence of Coleman's other crime through the testimony of the purported victim, Lyons; however, as described herein, Lyons recanted on the stand. This court was already tasked with making the determination of the admissibility of Ofc. Martin's testimony in the state's writ application, and it was concluded that Ofc. Martin's testimony was admissible pursuant to State v. Johnson, supra . Considering the same issue, we again, on appeal conclude the disposition was correct.
As noted in State v. Taylor, supra at 294 :
[W]hile the rules of evidence are relaxed in a pre-trial hearing to determine what evidence may be offered at trial, the state will obviously be required to adhere to the rules of evidence when presenting evidence of the [other crimes] at trial. Should the state not properly present competent evidence at trial, the trial court may exclude the other crimes evidence at that time.
The Louisiana Supreme Court in State v. Johnson , supra at 80, articulated this very point:
Assuming a proper foundation, the credibility of any witness may be attacked by extrinsic evidence, including prior inconsistent statements. La. C.E. art. 607(D). Admission of the evidence, which bears solely on the issue of credibility, turns on a judicial determination that the probative value of the extrinsic evidence is not substantially outweighed by undue consumption of time, confusion, or unfair prejudice. La. C.E. art. 607(D) ; State v. Owunta , 99-1569 (La. 5/26/00), 761 So.2d 528, 529 ; State v. Cousin , 96-2673 [96-2973] (La. 4/14/98), 710 So.2d 1065, 1071. When a non-party witness's credibility is attacked through prior inconsistent statements incriminating the accused, the evidence is generally not admissible for its assertive value as substantive evidence of guilt. Owunta , 99-1569 at 1, 761 So.2d at 529 ; Cousin , 96-2673 at 8-9, 710 So.2d at 1069. An exception to this general rule exists for cases in which the witness's prior inconsistent statement also constitutes a prior statement of identification for purposes of La. C.E. art. 801(D)(1)(c) ... [.] See United States v. Brink , 39 F.3d 419, 426 (3rd Cir. 1994) ("If at trial the eyewitness fails to remember or denies that he made the identification, the previous statements of the eyewitness can be proved by the testimony of a person to whom the statement was made, and the statement can be given substantive effect." ). (Emphasis added).
So it is in the instant case. Lyons, despite identifying Coleman to Ofc. Martin earlier, failed to remember that he was shot by Coleman at the trial of this matter, thus *1218 failing to identify his shooter on the witness stand as he had before in his hospital bed. Therefore, in order to prove Lyons' identification and previous inconsistent statement to the officer, it was necessary for the State to introduce the testimony of Ofc. Martin at the trial-evidence which was not considered hearsay pursuant to La. C.E. 801(D)(1)(c). Because previous statements regarding identity by an eyewitness can be proved by the testimony of a person to whom the statement was made, i.e. , Ofc. Martin, the statement also can be given substantive effect. Therefore, the testimony of Ofc. Martin was wholly admissible, both to show that Lyons had previously and positively identified Coleman and for the substantive effect that he was shot by Coleman. See State ex rel. D.W., 09-855 (La. App. 5 Cir. 09/14/10), 47 So.3d 1048 ; State v. Collins , 01-1459 (La. App. 4 Cir. 08/21/02), 826 So.2d 598, writ denied , 02-2490 (La. 06/27/03), 847 So.2d 1254. The trial court did not err on this issue.
Coleman also contends that the probative value of the other crimes evidence does not outweigh its prejudicial effect. Although we have found the other crimes evidence relevant and otherwise admissible at trial under art. 801(D)(1)(c), we must conduct a balancing test pursuant to La. C.E. art. 403 which states, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." Considering the weight of other evidence against Coleman, including the testimony of two eyewitnesses to the murder as well as compelling forensic evidence, we do not believe that the introduction of other crimes evidence created a danger of unfair prejudice, confusion, or misunderstanding by the jury. Because specific intent is an essential element of second degree murder, and also because Coleman claimed that he accidentally shot Brown when he dropped the gun, the evidence involving Lyons had significant relevance which would have substantially outweighed any alleged the unfair prejudice.
Inasmuch as a trial court's ruling on the admissibility of other crimes evidence will not be reversed absent an abuse of discretion, we conclude that the other crimes evidence was properly admitted at the trial of this matter, and the evidence is not substantially outweighed by the risk of undue or unfair prejudice to Coleman. Therefore, this assignment of error is without merit.
CONCLUSION
For the foregoing reasons, the conviction and sentence of Cortez Coleman are affirmed.
AFFIRMED.

When issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, we first determine the sufficiency of the evidence. State v. Hearold , 603 So.2d 731, 734 (La. 1992). We examine all the evidence considered by the jury, including evidence which may have been erroneously admitted. Id.

At the time of trial, Cuerto was deceased.