Judgment rendered July 16, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,229-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

Versus

ZAMIR K. MASSEY                             Appellant

* * * * *

Appealed from the
Forty-Second Judicial District Court for the
Parish of DeSoto, Louisiana
Trial Court No. 23-CR-33868

Honorable Amy Burford McCartney, Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By: Annette Fuller Roach

ZAMIR K. MASSEY                             Pro Se

CHARLES BLAYLOCK ADAMS               Counsel for Appellee
District Attorney

EDWIN L. BLEWER, III
ETHAN ARBUCKLE
Assistant District Attorneys

* * * * *

Before STEPHENS, HUNTER, and MARCOTTE, JJ.

**STEPHENS, J.**

This case arises out of the 42nd Judicial District, Parish of DeSoto, State of Louisiana, the Honorable Amy Burford McCartney, Judge, presiding. The defendant, Zamir H. Massey, was charged with the second degree murder of Kiondric Woodley in violation of La. R.S. 14:30.1 and the attempted second degree murder of Jermaine Price in violation of La. R.S. 14:30.1 and 14:27. A pretrial motion *in limine* filed by the defense seeking the exclusion of various social media videos made by Massey and photos from those videos was denied, and the prosecution was allowed to enter into evidence "snippets" from the livestreamed videos and still shots taken therefrom. Massey was convicted as charged by a unanimous jury. The defendant has appealed his conviction. His sole assignment of error is that the trial court abused its discretion in allowing the State to admit into evidence the Instagram Live videos and captured photos in violation of La. C.E. arts. 401-404. For the reasons set forth below, we affirm Massey's convictions and sentences.

## FACTS AND PROCEDURAL HISTORY

### *Facts/Relevant Testimony*

Late in the evening of June 13 and early morning hours of June 14, 2023, Massey and his friend Antonio Williams were riding around the Projects in Mansfield, Louisiana in a green Toyota Corolla. Throughout much of that time, Massey livestreamed on Instagram Live, something he did daily. Two of four video clips played for the jury during the testimony of Mansfield Police Department ("MPD") *Asst. Chief Michelle Thomas* primarily showed Massey singing along to rap songs playing in the

background.[1]  According to Asst. Chief Thomas' testimony, these songs were disturbing but "typical of what they see."  She clarified that the younger generation listens to this type of rap music.  Defense counsel pointed out that some of the references in the songs were about switches,[2] overkill, and killing 100 persons.  The asst. chief testified that she did not see a switch on Massey's gun, which was visible in several of the Instagram Live videos, and noted that he was just rapping to a song.  Williams, who was with Massey, testified that these phrases were just song lyrics.  In other clips from the videos, Massey talked about driving through the Projects multiple times.  Asst. Chief Thomas testified that her review of the recordings showed that Massey and Williams drove through the Projects between 10 and 13 times in a four to five hour period.

For about three hours, from midnight to 3:00 a.m., Williams and Massey hung out with other people in the Projects, leaving occasionally to drive around or go to the store.  At around 3:00 a.m., Massey and a girl later identified as Kashana left the Projects and went to her home.  Before 5:00 a.m., Massey called Williams to ask for a ride home, but Williams did not answer.  Several return calls by Williams were unanswered.  Massey called Williams back around 5:02 a.m. and was told that Williams was waiting outside.  At that point, the two men returned to the Projects.  Massey testified that it was because Williams wanted to buy a cigarette from

---

[1] It appears that while Massey was rapping along with the artist's lyrics in music playing in the background for some of the time, he also talked or rapped over the lyrics.

[2] During her testimony, Asst. Chief Thomas defined several terms they heard during the video clips, such as a switch, which actually has different meanings, but in this case refers to a gun or a mechanism on a handgun that turns it from a semi-automatic to full automatic.  She also explained to the jury that a headshot was when someone shot a person in the head.

someone he knew.  Originally, Williams told police this same thing, but at trial, he testified that he drove back to the Projects at Massey's request.

Meanwhile, in the early hours of June 14, 2023, Kiondric Woodley and Jermaine Price arrived at Shakyia Lane's apartment in the Projects. Sometime between 4:00 and 5:00 a.m., while Ms. Lane, Price, and Woodley were on her patio talking, JaMichael Whitaker showed up, and the group visited together for another 20-30 minutes.  When they saw a green Toyota drive down the street, they became concerned.

The testimony of Ms. Lane, Price, and Whitaker regarding the subsequent events varied; however, they agreed that, moments after the green Toyota passed, a figure came running around the corner of the building towards them, firing a weapon.  Woodley took off in one direction, and Ms. Lane and Price headed for the door of her apartment.

*JaMichael Whitaker* testified that the man he saw running towards them was Massey, who tapped Woodley and said "hey, boy."  Massey had a gun in his hand, and Whitaker ran because he didn't want to get hit.  As he ran, he heard "like three" gunshots.  After he ran up to the parking area, Whitaker turned around and walked back.  He saw Massey standing over Woodley, who was lying on the ground.  The shooter shot Woodley three more times.  At trial Whitaker identified the shooter as Massey.  In his statement a month earlier, however, Whitaker stated that it was very dark and he could see a figure but could not identify the shooter—he did not have a clue who the shooter was.  He also said that when he saw the man coming towards them, he "rolled out," he only came back after the shooting. Whitaker testified that Woodley and Price had masks on because no one was supposed to know they were there.

3

On redirect examination, Whitaker stated that he was mad when he was interviewed because he had been sitting in jail and lost his job because of it. When Whitaker testified before the grand jury and at trial that he knew it was Massey running at them with the gun shooting, Whitaker was under oath.

*Shakyia Lane* testified that Woodley and Price, who were her cousins, had come to her home in the early morning hours of June 14, 2023, about 30 minutes before the shooting. They were wearing black jackets and face coverings or masks. Ms. Lane described the one Woodley was wearing as a black mask covering most of his face. Woodley's father, who is her uncle, was staying at her home. She, Woodley, and Price hung outside on the porch for a while talking. Whitaker and a person called "Turbo" walked up. Woodley had indicated that something was going on, and he got nervous when he saw the green Toyota drive up Line Street.

Ms. Lane saw Massey, whom she knew well, jump out of the car with a gun and run towards her apartment. Shakyia stated that she knew who the man was because "I know him. I know his face. Like, I know exactly who I saw." He had on a white muscle shirt and a mask. Ms. Lane testified that Price ran behind her toward the apartment. Price was bleeding when he came into the apartment. Woodley was killed and Price was shot in the leg. After she called 911, she went outside and saw Woodley lying on the ground. Her neighbor, who is Woodley's cousin, was out there with him.

Although she had initially told one of the first officers on the scene that Massey had shot Woodley and Price, she admitted that she later told the police chief that it was either Woodley or Zack Ross. During her testimony at trial, Ms. Lane stated that she had no doubts when she told the first officer

4

the shooter was Massey.  According to Ms. Lane, people were "throwing names at her," and she became confused.  She admitted that she was scared that someone would try to do something to her.  Also, her dad had come to the scene, and he didn't like that the police were trying to take her recorded statement.

When asked on cross-examination about other statements she made to the police in later interviews, Ms. Lane admitted that she had told them that the shooter had dreads, looked like he had light skin, and said that it was either Massey or Ross.  She couldn't recall stating that it was dark and that she could not identify the person in a line-up.[3]  On redirect exam, Ms. Lane reiterated that she saw Massey with a gun; however, she didn't see him shooting.

*Jermaine Price* testified that around midnight, he and Woodley, who was his cousin, were in Shreveport.  Around 2:00 a.m., Price joined Massey's Instagram Live.[4]  When asked by the prosecutor whether he was

---

[3] Ms. Lane stated that Whitaker and Turbo had walked off prior to the shooting, and she did not know whether it was possible for Whitaker to have witnessed the shooting.  She did see Whitaker again after Woodley was shot, lying on the ground.

[4] The State introduced a transcript of the Comments during that portion of Massey's Instagram Livestream.  The following are the Comments made by Massey and Price during that time period.
Massey:  I done spent lik 30 times n***as dnt be out
Price:    Calm Down
            Oui Shi
            Percocet Party
            Mad Max
Massey:  Yk it Jermaine
. . .
Price:    Fuck up bitch
            Zac Yu a state skipper
            Whoever Wanna Fight
            Anybody
            Sb
            I Wanna Fight Em Too
            No guns
            Come to the road and hug me
            AJ Waddup
            Eb

mad at Massey, Price said that he had "been wanting to whoop [Massey] but he never wanted to do nothing." Price stated that he and Woodley drove down from Shreveport shortly before the shooting. Woodley and Price had seen Massey on Instagram Live posting and calling them out. Around 3:00 a.m., they left Shreveport headed for Mansfield to pick up Woodley's father from Ms. Lane's because of what Massey was posting on Instagram Live. Woodley brought a Glock 27 .40 caliber handgun. They drove down in Woodley's car, a Dodge "Scat Pack" Charger, but left it at Price's grandmother's house and took her Chevy Trailblazer to attract less attention. Price testified that they didn't want the car or themselves to get shot.

They made it to the Projects around 4:00 or 5:00 a.m. They visited with Woodley's daddy and Ms. Lane for a while. Whitaker and Turbo knocked on the door, and they hung out on the side by the playground with them for a while. At some point Turbo and Whitaker walked off. Price said that both he and Woodley had something on their heads; he had on a hood,[5] and Woodley had a hat on. He was wearing black, and Woodley had on a black top and grey jeans. Price got concerned when he saw the green Toyota drive by. It went straight up Line Street then out of their view. They then saw Massey hit the corner by the building just across the sidewalk from the

---

Everywhere
N***a Stay Seeing Me
Guns down fist up
Rec call
Fight me n***a
F***yo baby n***a
I Wanna fight
Anybody that gotta gun
Tell uh N***a put that gun down
Boy

[5] On cross-examination, Price admitted that the "hood" he had on was something connected to his jacket that went around his entire head, came up by his face, and ended at his forehead.

6

playground. Massey was shooting as he ran "ducking down low" towards Ms. Lane's house.

Price testified that he knew the man was Massey because he was wearing the same thing he had on while on Instagram Live—a camo hat, white muscle shirt, jeans, and with a black gun. Price never left the porch and was hit two times. He denied pointing a gun at Massey and did not believe that Woodley had done so. Price acknowledged that Woodley had a gun he had gotten from someone in Shreveport before they left to come to Mansfield, but he did not know where the gun had gone and did not see it after the shooting.

*Antonio Williams* testified at trial pursuant to a plea agreement. Williams stated that he was with Massey "basically" the 24 hours before the murder. They chilled and rode around, hanging out at different places, including near the playground in the Projects for several hours the morning of the shooting. As they drove around in the green Toyota Williams normally drives, Massey was looking for Woodley and Price. Williams stated that even though he "talked crap" to Woodley on Instagram Live[6] and they had a heated argument, he wasn't beefing with him and Price. Williams wanted to fight Woodley and Price because they wanted to fight with him. When the prosecutor showed Williams an IM conversation between him and Massey from the day prior to the shooting (June 13, 2023), Williams

---

[6] Williams explained to the jury that "Insta Live" was to record yourself doing "really anything" while broadcasting it in real time. That person can comment on it while recording by typing on his/her phone keypad. Other people watching can see the comment. If the person recording wants people to join in, that person can add them or the people can request to join and the person on Live can add or accept the request(s). Also, Instagram has a separate way that its users can message each other called Instant Messaging ("IM").

acknowledged that Massey wanted to fight Price and Woodley also. Massey had his .40 Glock on him that night.

The prosecutor brought up specific snippets of the Instagram Live videos with Williams. Williams stated that in Video 2, when Massey said "Spin back through the 'jets [projects] to see if I can find a n***a posted up somewhere," he was talking about going back to the same spot near Shakyia Lane's apartment, which they actually did. According to Williams, Massey was looking for Woodley and Price to be outside somewhere. Williams just wanted to fight them. He "couldn't recall" what Massey wanted to do. When Massey said in Video 2 "50 blocks through this B-word. Not out here," he meant that he couldn't find Woodley and Price, and "I'm out here all night. N***as better have a switch," meant a fully automatic gun or just a handgun.

Williams explained that during Video 4, Massey's comment about "head shot" was a reference to someone getting shot in the head; "overkill" meant a person standing over someone and shooting them; "I am a shark" referred to something bigger and badder. Williams stated that Price joined Massey's Live broadcast (Video 4) between 1:30 and 2:00 a.m. on June 14, 2023. At that time, Massey was standing on the corner of Line and MLK Streets just on the other side of the playground from Ms. Lane's apartment.

At some point after the Instagram Live videos, they split up. Massey left the playground with a girl named Kashana to go to her house. Williams was still hanging out on Line Street before going to his house on South Washington Street. Later that morning he tried to contact Massey from his girl's phone to tell him he was outside Kashana's house to pick him up. Eventually Massey called him back. According to Williams, he was not

8

calling Massey to tell him that Woodley and Price were standing outside of Ms. Lane's just before 5:00 a.m.[7]

Williams picked Massey up from Kashana's house, and the two men headed to the Projects. According to Williams, although he had told police after the shooting that he had gone to buy a cigarette, at trial he testified that he drove by Ms. Lane's apartment at Massey's request. When he and Massey arrived at the Projects, Williams pulled up to a parking area known as the "hole," and Massey got out of the car and went behind the apartments. Williams turned his car around to face outward. About three minutes later, Williams heard shooting and "got low" or ducked down inside the car. Williams testified that, as he pulled away, he saw Massey walk in front of his car. By that time, the shooting had stopped. Massey got in the car and told him to go. The two men then left, and he dropped Massey off at his home.

To explain the discrepancy between his trial testimony where he said he saw Massey get out of the car with a gun, and his statement given shortly after the incident in which he told officers that he did not see Massey with a gun when he got out of the car, Williams said, "I just didn't see it at the time." On cross-examination, Williams stated that when the prosecutor was talking about "switch," "head shot," and "a 100 fall," what "they" were doing was just repeating the song lyrics. He and Massey did not have the intent to go out and kill 100 people in the projects. Williams testified, "It's just a song."

---

[7] The timing of Massey's unanswered calls back to Williams were 4:52, 4:53, and 4:54 a.m.; Williams answered the one made by Massey at 4:55 a.m.

*Zamir Massey* took the stand.  He testified that Williams picked him up driving the green Toyota that morning and they went to the store, got some alcohol, went to the Projects, and made a lot of videos.  Massey stated that he made a lot of Instagram videos just "talking crazy" that day.  He wasn't calling anyone out or anything, he was just having fun.  They did a lot of drinking, sitting around the Projects.  When they left, he went with Kashana to her house to chill out, having met up with her by the swing sets by Line Street.

Massey called Williams several times when he was ready to leave KaShana's house but Williams didn't pick up the phone.  His intentions were to go to his house, which was about half a mile from Kashana's.  Then Williams called him back to let him know he was on the way.  There was no one else in the car when Williams picked him up,[8] and they headed back to the Projects.  As they drove up Line Street, Massey told Williams he was going to "go [Instagram] Live again."  Massey got out of the car and was heading towards the playground at the end of the street.  Williams parked at the top of Line Street on the left side of the parking lot.

Massey stated that he walked through the grass then around the corner of one of the buildings to sit on one of the benches by the swing set.  As he was looking down at his phone he heard someone yell, "Say, boy" at him.  He turned and went toward that person to see who it was and what they wanted.  That person then said, "N***a, F*** U."  As Massey walked toward the group, he saw one of the persons start to raise a gun toward him, so he grabbed his gun and started "wild firing."

_____

[8] Earlier that evening, Williams' girlfriend had been with the two men for a period of time.

According to Massey, he didn't recognize the two individuals—they had on all black and ski masks.  Massey spoke to them, and one of them spoke to him.  "That's when he started coming up with the gun.  I hurried up and pulled mine out and just pulled mine out and just started wild firing to protect myself … I didn't know what their intentions were."  He had no intent to shoot Price and shot only because the other person, later identified as Woodley, was raising his gun to shoot him.

After the person fell down, Massey went near that person to see if he had been shot.  He saw the person, gun in hand, attempt to get up.  Massey stated that he panicked and shot at the person a few more times.[9]  Everything happened in a span of 10-15 seconds.  Massey denied that he had the specific intent to shoot or harm either Price or Woodley.  Massey testified that Williams was already heading down because he had heard the shots.  He got in the car and went home to his aunt's house in shock, later going to a cousin's home.  Upon hearing that a group was on the way to do him harm, he left and ultimately decided to leave the area.  He went with a girl named Keisha to her home in Addison, Texas.

*Dr. Long Jin*, the forensic pathologist who performed the autopsy on Woodley, testified that he had six bullet hole entry wounds from just below his belly button up to his left eye.  Dr. Jin noted that one abdominal shot had seared edges, which was suggestive of a contact wound.

---

[9] On cross-examination, Massey testified that he walked over to the person lying on the ground because the other person had run away.  He could still see the gun in the man's hand, and the man was still moving on the ground.  According to Massey, "he could have been playing possum … I didn't know."  Massey doesn't know how close he was to Woodley when he shot him—Woodley said that he was close, maybe 2 ½ steps away.  He was "100%" he was not standing right over the victim as he fired the last few shots.

*Detective Russ Jones*, who works in Criminal Investigations with the DeSoto Parish Sheriff's Office, stated that he worked the crime scene the morning of the shootings. Det. Jones testified about the location of the shell casings found—particularly their proximity to Woodley, the deceased victim.

### *Procedural History*

A bill of information was filed on July 28, 2023, charging Massey with the attempted second degree murder of Jermaine Price on or about June 14, 2023, in violation of La. R.S. 14:30.1 and 14:27. Massey waived formal arraignment and entered a not guilty plea to this charge on August 2, 2023. An indictment was filed on October 4, 2023, charging Massey with the second degree murder of Kiondric Woodley on or about June 14, 2023, in violation of La. R.S. 14:30.1, and the attempted second degree murder of Jermaine Price on or about June 14, 2023, in violation of La. R.S. 14:30.1 and 14:27. Massey waived formal arraignment and entered not guilty pleas to both charges on October 9, 2023. Massey entered a plea of not guilty to both charges on October 9, 2023. A number of search warrants were issued and executed for various phone records.

On April 8, 2024, a "Notice of Self Defense" and a "Motion to Suppress Search Warrants" was issued for the phone records of Massey and several witnesses. The motion to suppress was granted by the trial court on April 16, 2024. Also on April 16, 2024, the defense filed a "Motion in Limine to Exclude Evidence" of various social media posts and still shots from the evening before and morning of the shootings. The trial court heard arguments from counsel and received the objectionable evidence that day, then took the matter under advisement.

12

On April 22, 2024, prior to the beginning of jury selection, the trial court stated that after reviewing the submitted information, it was denying the motion *in limine*. The court further noted that it had spoken with the prosecutor, who had reduced the video clips from 50 minutes to about 15 minutes. According to the trial court, the video's contents were not so prejudicial that they outweighed the probative value of the video. Furthermore, although there was some bad language, it was not so disturbing that it could not be overlooked by the jury. Defense counsel objected to the trial court's ruling and asked that its objection be considered as ongoing throughout the trial.

Jury selection took place on April 22 and 23, and the trial was held on April 24 and 25, 2024. The jury returned unanimous verdicts of guilty as charged on both counts. Massey filed a *pro se* motion for post-verdict judgment of acquittal on May 1, 2024, which was denied by the trial court on May 29, 2024. On that same date, the trial court sentenced Massey to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence on the second degree murder conviction and 30 years' imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence on the attempted second degree murder conviction. The sentences were ordered to be served concurrently, and Massey was given credit for time served.

A motion to reconsider sentence was filed on June 5, 2024, and denied on June 10, 2024. Massey filed the instant appeal.

## DISCUSSION

Massey has assigned as error the trial court's denial of his pretrial motion *in limine*, which allowed the State to introduce into evidence social

13

media posts and still photos of him.  According to the defendant, this evidence was violative of La. C.E. arts. 403 and 404 as its probative value was outweighed by its prejudicial effect.  Defense counsel also asserts that during trial, the court committed further error by failing to limit the admission and use of this evidence after defense counsel argued that this evidence was not relevant.

Massey argues that, due to the graphic nature of the social media videos and photos, he suffered unfair prejudice.  He cites *State v. Jenkins*, 23-1477 (La. 3/19/24), 381 So. 3d 699, 700, in which the Supreme Court found that the videos in that case were "of such a graphic nature that the danger of unfair prejudice substantially outweighs their slight probative value.  Furthermore, the videos are not needed to complete the State's narrative of its case."

The trial court, in denying the defendant's pretrial motion *in limine* in the instant case, found the content of the video clips "not so prejudicial that it would outweigh the probative value in the Court's opinion.  There is some rap music, you know, playing in the background and sometimes being sung by the defendant.  But, other than some language, I don't find it to be anything that would be so disturbing that the jury couldn't overlook that." Defense counsel made an objection to the ruling, and asked that the objection be continuing, as the trial was about to begin.

According to Massey, the trial court abused its discretion in admitting the video clips.  First, the trial court failed to address the issue of whether the videos were a creative expression which would bar their admissibility under La. C.E. art. 404(B) unless the State proved the existence of an exception warranting their admissibility.  Second, although the trial court noted that

14

their probative value outweighed their prejudicial effect, the court failed to note *what* probative value the videos and photos had in this case. Finally, the trial court failed to verify the specific videos or photos it had considered or reviewed in arriving at its ruling or state what videos were to be presented to the jury.

Two of the State's witnesses, Asst. Chief Thomas and Antonio Williams, testified that some phrases from various livestreamed recordings played by the State were not Massey's own words but were rap song lyrics he was singing during the livestreams. Additionally, several of the still images showed Massey brandishing a gun. There was testimony at trial that these images were similar to and mimicked publicized images of various rappers.

According to the defense, the State failed to establish that the videos or still shots were independently relevant and did not justify their independent admissibility at trial. The defense had filed a notice of intent to assert a self-defense claim, which was an admission of Massey's presence at the location of the shooting as well as an admission that he was armed and fired shots. Defense counsel's opening argument also placed Massey at the scene of the shooting. These admissions mooted the State's need to prove identity or offer proof of Massey's involvement in the shooting.

According to the defendant, the prejudicial effect of this evidence was highlighted by the prosecution's reference to several of the song lyrics during its closing arguments, made after two of its own witnesses, Asst. Chief Thomas and Antonio Williams, testified that these words were not even Massey's own words. Appellate counsel reiterates that these were highly inflammatory lyrics from rap songs, music listened to by the younger

generation as testified to by Asst. Chief Thomas. Massey disputes that they were indicative of his mindset. The State's attempt to show that he acted in conformity with these lyrics was prejudicial, and the evidence was improperly admitted into evidence in violation of La. C.E. arts. 401-404.

Massey urges this Court to find that the trial court abused its discretion when it allowed into evidence the Instagram Live videos and photos. He asks this Court to set aside his conviction and sentence and order a new trial.

According to the State, the trial court did not abuse its discretion in admitting the Instagram livestreams and stills into evidence. They show Massey with the murder weapon, that the defendant was at the location of the crimes, and that he was talking about the number of times he was at or near that location. This bolsters the State's theory that the defendant was out hunting for the victims.

Additionally, the Instagram Live evidence shows the mindset of Massey and his specific intent to kill. The State contends that the video clips' probative value was not outweighed by its prejudicial value under La. C.E. art. 403, which is what the trial court correctly determined. The State notes that it cut down "copious" amounts of Instagram footage to the "limited" amount it showed at trial. The State calls the defendant's argument that these videos are artistic expressions of Massey's meritless. According to the State, the background music and the defendant's rapping to parts of songs in the video clips was viewed by the jury for what it was—Massey's mindset and plan to hunt down and kill the victims—a plan he carried out exactly as he described. The evidence gave the jury a clear line

16

of sight into the defendant's intent to call out, hunt down, and then shoot his intended victims.

Nonetheless, the harmless error rule is applicable, notes the State. *See, Sullivan v. Louisiana*, 508 U.S. 275, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993), wherein the Supreme Court held that the harmless error inquiry is whether a guilty verdict rendered in the trial at issue is surely unattributable to the error. If the trial court erred in allowing the complained-of media and photos into evidence, then the error is harmless. The State urges that there is "insurmountable" evidence that led to Massey's conviction in this case.

According to the State, there are eyewitness accounts of Massey committing the shooting (Massey's own testimony, although he claims it was in self-defense) or running towards the two victims armed with a gun. Whitaker and Price identified Massey as the shooter. Ms. Lane testified that Massey ran towards their group armed with a gun. The testimony of these three witnesses alone is enough to convict the defendant.

The State contends that its other evidence discredited Massey's self-defense claim. Dr. Jin testified that Woodley suffered a contact wound, which suggests a personal and deliberate firing. Detective Russ Jones testified that the shell casings suggested that the shooter advanced from the sidewalk towards the location of the victims, a contradiction of Massey's testimony that he stood his ground and fired to protect himself. There was no alternative conclusion the jury could have made, asserts the State.

The State asks this Court to affirm the defendant's conviction based upon its finding that the trial court did not abuse its discretion in determining that the Instagram videos and clips were admissible. Alternatively, if there

was an abuse of discretion, it was harmless error in light of the

overwhelming evidence in support of Massey's guilt.

### *Applicable Legal Principles*

Although evidence of other crimes, wrongs, or acts is not admissible

as evidence of a defendant's character, it may be admissible if the State

establishes an independent and relevant reason for its admission.  La. C.E.

art. 404(B)(1); *State v. Miner*, 17-1586, p. 1 (La. 1/4/18), 232 So. 3d 551,

552.  La. C.E. art. 404(B)(1) provides in part:

(a) Except as provided in Article 412 or as otherwise provided by law, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

(b)(i) For purposes of this Subparagraph, "creative or artistic expression" means the expression or application of creativity or imagination in the production or arrangement of forms, sounds, words, movements, or symbols, including music, dance, performance art, visual art, poetry, literature, film, and other such objects or media.

(ii) Except as provided in Article 412 or as otherwise provided by law, creative or artistic expression is not admissible in a criminal case to prove the character of a person in order to show that he acted in conformity therewith, provided that the accused provides reasonable notice to the prosecution in advance of trial asserting that the evidence is creative or artistic expression.  Evidence of creative or artistic expression may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such

18

purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

La. C.E. art. 401 defines relevant evidence as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La. C.E. art. 402 provides that all relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of Louisiana, this Code of Evidence, or other legislation.

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time. La. C.E. art. 403. The term "unfair prejudice," as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the fact-finder into declaring guilt on a ground different from proof specific to the offense charged. *State v. Horton*, 55,468 (La. App. 2 Cir. 2/28/24), 380 So. 3d 841, *writ denied*, 24-00365 (La. 10/1/24), 393 So. 3d 864.

The trial court, in exercising its gatekeeping function, must determine the independent relevancy of the evidence and balance the probative value of the character evidence against its prejudicial effects before the evidence can be admitted. *Huddleston v. United States*, 485 U.S. 681, 108 S. Ct. 1496, 99 L. Ed. 2d 771 (1988); *State v. Miner*, *supra*; *State v. Taylor*, 01-1638 (La. 1/14/03), 838 So. 2d 729; *State v. Coleman*, 52,074 (La. App. 2 Cir. 11/14/18), 259 So. 3d 1203. A district court's ruling on the admissibility of evidence will not be reversed absent an abuse of discretion. *Id*.

19

*Analysis*

We find that the Instagram Live video clips were not only relevant but highly probative of Massey's state of mind before the shooting, and the trial court did not abuse its discretion in finding that the probative value of this evidence was not substantially outweighed by the danger of undue prejudice. Statements made or actions taken by a defendant showing his attitude, state of mind, and intent to commit the crime charged are not subject to exclusion under La. C.E. art. 404(B). Massey's Livestreaming of himself singing or rapping along to music with explicitly violent lyrics and of his comments while standing on the corner across from the crime scene prior to the shooting (which was when the IM exchange between Massey and Price took place) are highly relevant evidence on his state of mind/intent when, just a few hours later, Massey went back to that exact spot and viciously shot Woodley and Price. Additionally, we conclude that the still shots of Massey waving the murder weapon are also evidence of his intent and plan to kill the victims.

Finally, we agree with the State that the Instagram Live evidence was necessary to complete its narrative of its case. Although all evidence of other crimes or bad acts is prejudicial to a defendant, the other crimes evidence in this case was necessary to give the jury a complete picture of the events that gave rise to the instant offenses and led to the defendant's arrest, as well as a context within which to evaluate his claim that he acted in self-defense. *See*, *State v. Taylor*, 01-1638, pp. 16-17, 838 So. 2d at 745.

Based upon the above analysis, it is unnecessary for us to reach the issue of whether Massey's singing along with a rap song (apparently not his own) during his Instagram Livestream is a "creative or artistic expression"

20

within the legislature's intendment when it added subsection (b)(ii) to La. C.E. art. 404(B)(1), since evidence on the issues of motive, intent, and integral part/context are admissible under *both* subsections (a) and (b)(ii) of art. 404(B)(1).

Our error patent review of the record discloses none.

## CONCLUSION

For the reasons set forth above, the convictions and sentences of the defendant, Zamir K. Massey, are affirmed.

**AFFIRMED.**